780 P.2d 1055

George UDY and Laura Udy, his wife; George W. Udy, their minor child, Plaintiffs–Appellants,

v.

CALVARY CORPORATION, an Arizona corporation, d/b/a Green Valley Mobile Home Park, and Robert Hanson, Defendants–Appellees.

No. 1 CA–CV 88–029.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 17, 1989.

Appeal Dismissed Oct. 30, 1989.

Treon, Strick, Lucia & Aguirre by Arthur G. Newman, Jr. and Cindy Hansel Strickland, Phoenix, for plaintiffs-appellants.

Michael Herzog and Lewis and Roca by Brian Goodwin, Susan M. Freeman and Thomas E. Klinkel, Phoenix, for defendants-appellees.

## OPINION

BROOKS, Judge.

Appellants George Udy and Laura Udy appeal from summary judgment entered for appellees Calvary Corporation and Robert Hanson on the Udys' negligence claim for personal injuries suffered by the Udys' minor child, George W. Udy (Georgie), when he was hit by a truck on Southern Avenue in Phoenix. To resolve the appeal, we must determine (1) whether a landlord has a duty to exercise his retained control over his tenants' use of the premises so as to protect them from a danger located outside the premises; and (2) if so, whether the landlord in this case fulfilled that duty as a matter of law. We also discuss whether the Udys' notice of appeal was sufficient to confer jurisdiction upon this court to review the trial court's judgment as to Georgie's claim as distinct from the claims of his parents.

## FACTS AND PROCEDURAL HISTORY

On appeal from a summary judgment, the facts are viewed in the light most favorable to the party against whom judgment was taken. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 710

P.2d 1025 (1985). In that light, the facts are as follows. Calvary Corporation owns the Green Valley Mobile Home Park ("the park") on Southern Avenue in Phoenix. Robert Hanson is president and sole shareholder of Calvary Corporation. At the time of the accident that resulted in this litigation, Yvonne Colson was the on-site manager for the park. She was an agent of Calvary Corporation and took her orders from Robert Hanson.

The Udys and their children, Megan, Shannon, and Georgie, moved into the park on February 22, 1985. The mobile home space that they rented was next to Southern Avenue, a major east-west street with a speed limit of 45 miles per hour. Although two of the three neighboring spaces in the park that bordered on Southern Avenue were fenced, there was no fence on the space that the Udys rented.

When the Udys first drove out to look at the park, the traffic on Southern was not heavy. The Udys had not lived in that part of town before, and Laura Udy thought that Southern Avenue was more of a rural road than a busy main street. Before the Udys rented the space, Laura Udy asked manager Yvonne Colson about the traffic and told her that she did not want the space if it was in an area of heavy traffic. Colson told her that there had never been any problems in the past as a result of the space's close proximity to Southern.

By signing Calvary Corporation's rental agreement, the Udys agreed to comply with the "park rules and regulations." Paragraph 4 of the rules and regulations provided:

No construction, additions, alternations [sic], carports, structures, fences or the like may be built unless first approved in writing by the Management; and if approved, they may not be removed without prior written permission.... .

Paragraph 18 provided:

Fencing must be chain link type, with vertical and horizontal Pipe supports running the entire length of the fence. Drawings and plans must be submitted to Management. Prior written approval must be secured from Management.

Fencing that does not comply with Park Rules, Regulations and standards must be removed within sixty (60) days after these Rules and Regulations become effective.

Robert Hanson alone had the authority to approve any change to a mobile home space. Many tenants had asked for permission to erect fences either for the safety of their children or because of problems with prowlers, but their requests had been refused. Hanson has never given a tenant permission to erect a fence either before or after the accident that gave rise to this lawsuit. Colson testified that it was her understanding that Hanson would never grant any tenant permission to erect a fence for any reason.

Shortly after the Udys moved into the park, they realized that the traffic on Southern Avenue was generally much heavier than it had been on the day they rented their space. Within the first week after they moved in, Laura Udy asked Hanson for permission to put up a fence around their yard. He refused permission. She later asked if they could fence the back yard, offering to do so at their own expense. Hanson again refused permission. She repeated her requests to manager Colson within the first month or two after the Udys moved in. Colson relayed the requests to Hanson, who refused permission again. George Udy received a similar response from Hanson each of the two or three times he spoke to him about fencing the yard. Laura Udy told both Colson and Hanson that she wanted a fence for the safety of her children.

Laura Udy allowed her children to play only on the north side of their mobile home (the side away from Southern Avenue), and she tried to have them play in other areas wherever possible, such as near the Colsons' mobile home or at the park's laundry room. Although the park was advertised as a family park, it contained no established area where children could play. At first the Udy children were permitted to play around the laundry room, but Hanson later ordered that they play in their own

yard and threatened to evict the Udys if the children played elsewhere.

The Udys considered the traffic on Southern Avenue to be a danger to their children from the first month of their tenancy. Throughout the sixteen months that the family resided at the park before the accident, George and Laura Udy repeatedly warned their children, including Georgie, about the danger of traffic on Southern Avenue. The Udys wished to move, but could not afford to relocate their mobile home.

On June 21, 1986, the day of the accident, seven-year-old Georgie played basketball with his eighteen-year-old cousin while Georgie's mother and sisters were away from home. Later that day, George Udy gave Georgie permission to take the basketball outside to play again. Georgie and his cousin went outside while George Udy stayed inside to play a video game. While the boys were playing, the ball rolled out of the yard and onto Southern Avenue. Georgie followed three or four feet behind the ball, looking straight at it with his hands outstretched. A truck was approaching westbound only four to ten feet away when the child entered the street, and the driver was unable to take evasive action. The truck struck Georgie as he bent to reach for the ball. Paramedics were able to revive the child, but he sustained severe, permanent brain damage, a badly broken leg, and multiple other injuries. For the purpose of this appeal only, Calvary Corporation and Hanson have conceded that the absence of a fence around the Udys' yard was a proximate cause of Georgie's injuries.

The Udys commenced this action, initially naming Calvary Corporation and John Does I–X as defendants. The defendants later moved for summary judgment. The Udys moved to amend their complaint to add Hanson as a defendant. The trial court granted that motion, and the parties agreed that the trial court's ruling on the motion for summary judgment would apply to both Calvary Corporation and Hanson. We will therefore refer to Calvary Corporation and Hanson collectively as "the Landlord" in the discussion that follows.

By minute entry of October 21, 1987, the trial court granted the Landlord's motion for summary judgment without stating its reasons. Following entry of formal judgment on November 9, 1987, counsel for the Udys filed a timely notice of appeal. The caption of the notice of appeal identifies Georgie Udy as a plaintiff along with George Udy and Laura Udy, but the body states only:

NOTICE IS GIVEN that plaintiffs George Udy and Laura Udy appeal to the Court of Appeals, Division One, from the Judgment in favor of defendants entered November 9, 1987.

## JURISDICTION OF APPEAL AS TO GEORGIE'S CLAIM

■ The Landlord contends that Georgie's claim is not before this court on appeal because the notice of appeal did not name him as one of the parties appealing. The Udys dispute that contention, arguing that George and Laura Udy are the only true parties plaintiff and that from the start they have asserted Georgie's claim in their own names as Georgie's representatives. They note that they have been identified throughout the pleadings as acting in the dual capacity of guardians of their minor son and claimants in their own right.

Citing *Hanen v. Willis*, 102 Ariz. 6, 423 P.2d 95 (1967), the Udys argue that as long as the Landlord had sufficient notice of the appeal and the notice of appeal neither misled nor prejudiced it, any clerical error may be disregarded.

Our supreme court stated in *Hanen*, "[W]hen adequate notice to appeal has been given to the other party, no mere technical error should prevent the appellate court from reaching the merits of the appeal." 102 Ariz. at 9, 423 P.2d at 98. We agree that the Udys' notice of appeal was sufficient to give notice of their intention to appeal the judgment on Georgie's behalf as well as their own. It was clear to both sides from the beginning that George Udy and Laura Udy were prosecuting this action as representatives of their son Geor-

gie. The Udys' complaint alleged in paragraph I:

> Plaintiffs are residents of Maricopa County, Arizona. Plaintiffs George Udy and Laura Udy bring this action as the guardian ad litem for their minor son, George W. Udy (hereinafter referred to as "Georgie"), and on their own behalf as Georgie's parents.

The Landlord's "cross claim" likewise alleged:

> On or about February 2nd, 1987, Cross-defendants individually and as the guardian of George Udy, a minor person, filed a Complaint against the Cross-claimants for personal injuries allegedly suffered by George Udy on or about June 21, 1986.

■ Furthermore, the Landlord has never asserted that the Udys' failure to notice an appeal by Georgie himself was misleading or prejudicial in any way. That omission was therefore at most a "technical error" that did not prevent the perfection of the Udys' appeal as to Georgie's claim. *See City of Phoenix v. Bellamy,* 153 Ariz. 363, 736 P.2d 1175 (App.1987).

### THE MERITS

We next consider whether the trial court correctly granted the Landlord's motion for summary judgment. As we have noted, the trial court did not state its reasons for so ruling. We must therefore examine the Landlord's alternative contentions in support of its motion: (1) that a landlord has no duty to a tenant with respect to dangers outside the leased premises; and (2) that even if the Landlord owed the Udys a duty with respect to the danger of traffic on Southern Avenue, the duty was to remedy the danger or warn of it, and the duty to warn was fulfilled as a matter of law because the danger was "open and obvious." We find no merit to either argument.

*Duty of Landlord to Tenant.*

In arguing that under Arizona law a landlord owes no duty to his tenants with respect to off-premises dangers, the Landlord relies on the following language from *Markowitz v. Arizona Parks Board,* 146 Ariz. 352, 706 P.2d 364 (1985):

> The question of duty is decided by the court. The question is whether the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff. If the answer is no, the defendant is not liable even though he may have acted negligently in light of the foreseeable risks.

146 Ariz. at 356, 706 P.2d at 368. The Landlord reasons that because the "relationship" in this case is that of landlord and tenant, and because the landlord-tenant relationship is limited to the boundaries of the leased premises, a landlord has no duty to protect a tenant from dangers located outside the premises. Although this reasoning has a certain facile appeal, it finds no support in *Markowitz* or any of its doctrinal predecessors. *See Coburn v. City of Tucson,* 143 Ariz. 50, 691 P.2d 1078 (1984); *Beach v. City of Phoenix,* 136 Ariz. 601, 667 P.2d 1316 (1983); *Tribe v. Shell Oil Co.,* 133 Ariz. 517, 652 P.2d 1040 (1982). None of those cases held that the geographic limits associated with a particular relationship necessarily delimit the scope of any duty of care imposed upon the parties to the relationship.

■ To the contrary, as we recently stated in *Bach v. State,* 152 Ariz. 145, 730 P.2d 854 (App.1986), "[o]nce a duty is established, the foreseeability of harm governs the scope of that duty." 152 Ariz. at 148, 730 P.2d at 857. Harm that is caused, in whole or in part, by an activity or condition on particular premises cannot be viewed as unforeseeable as a matter of law merely because it happens to manifest itself beyond the property line.

The Arizona Supreme Court has characterized the duty of a landlord to his tenants as follows:

> [T]he landlord is under a duty of ordinary care to inspect the premises when he has reason to suspect defects existing at the time of the taking of the tenancy and to either repair them or warn the tenant of their existence. *In other words he is under the duty to take*

*those precautions for the safety of the tenant as would be taken by a reasonably prudent man under similar circumstances.*

*Cummings v. Prater,* 95 Ariz. 20, 26, 386 P.2d 27, 31 (1963) (emphasis added; footnote omitted); *see Stephens v. Stearns,* 106 Idaho 249, 678 P.2d 41 (1984) (citing *Cummings* as placing Arizona among jurisdictions that follow modern trend abandoning strict application of doctrine of *caveat emptor* in landlord-tenant relationship); *see also Presson v. Mountain States Properties, Inc.,* 18 Ariz.App. 176, 501 P.2d 17 (1972).

■ Accordingly, the Landlord's duty in this case was to take such precautions for the tenants' safety as a reasonably prudent person would take under similar circumstances in light of the known and foreseeable risks. *See Markowitz,* 146 Ariz. at 356–57, 706 P.2d at 368–69. The fact that Georgie's injury occurred beyond the boundaries of the leased premises may well be relevant in determining whether the Landlord acted reasonably, but it does not compel the conclusion that the Landlord owed Georgie no duty of care in the first place. We addressed a contention similar to the Landlord's in *Bach.* In that case, a motorist who was driving on a public highway fell asleep at the wheel, drifted off the highway onto the paved shoulder, and hit an unguarded box culvert. The motorist brought an action against the state for negligent design and maintenance of the highway. In reversing a directed verdict for the state, we stated:

[T]he existence of a duty by the State cannot hinge upon the conduct of the traveler in leaving the highway. Once a duty is established, the foreseeability of the harm governs the scope of that duty. If it is foreseeable that a traveler will leave the paved surface, his conduct in doing so is relevant to the issue of the driver's contributory negligence. It is not relevant to the initial question of whether a duty exists.

. . . .

. . . The state's duty to maintain a safe highway encompasses the foreseeable risk that for any number of reasons, including negligence or inadvertence, a traveler might deviate from the paved surface onto the adjacent shoulder. Accordingly, we hold that the state's duty to maintain safe highways extends to those areas adjacent to the paved roadway where a vehicle might reasonably be expected to travel.

152 Ariz. at 148, 730 P.2d at 857. Contrary to the Landlord's argument, the holding in *Bach* was not implicitly limited by the asserted fact that the state owned both the highway and the adjacent shoulder on which the plaintiff was injured. The ownership of the property on which the injury occurred played no part in the court's analysis. *Bach* held in essence that the extent of an existing duty of care was to be determined not with reference to physical locations, but rather with reference to the foreseeability of harm from the hazardous condition.

Our analysis in this case is similar to that of the Montana court in *Limberhand v. Big Ditch Co.,* 706 P.2d 491 (Mont.1985). In that case the eighteen-month-old child of a person who was visiting a tenant of the Apple Creek Apartments wandered across the apartment parking lot and fell into an irrigation ditch adjacent to the apartment owner's property. In reversing summary judgment for the apartment owner, the court stated:

The area owned by Nicholsons adjoining the irrigation ditch was in the dominion and control of Nicholsons. If the instrumentality causing harm is located adjacent to the landowner's property, and the instrumentality poses a clear and foreseeable danger to persons properly using the landowner's premises, we see no reason to shield the landowner from liability as a matter of law. A duty to take some reasonable precautions may exist. This duty may in some instances be discharged by a warning; under other circumstances remedial action may be required. A jury should be given the opportunity to determine if Nicholsons used reasonable care under the circumstances in discharging any duty they may have owed to Jaylon Limberhand to maintain a

safe premises. The fact that the irrigation ditch was not located on Nicholsons' land does not as a matter of law bar appellant's claim.

706 P.2d at 499–500. The court's mode of analysis in *Limberhand* is fully congruent with that employed by our supreme court in *Markowitz*.

We recognize that decisions from other jurisdictions have held for the defendants as a matter of law in analogous fact situations. *See Jones v. United States*, 241 F.2d 26 (4th Cir.1957) (primary duty to inform, advise and protect child was parents'; danger was open and obvious); *McCarthy v. New York, New Haven and Hartford Railroad Company*, 240 F. 602 (2d Cir. 1917) (landlord had no duty to its tenants to erect a fence); *Golf Club Co. v. Rothstein*, 97 Ga.App. 128, 102 S.E.2d 654 (1958), *aff'd*, 214 Ga. 187, 104 S.E.2d 83 (1958) (steep ravine at edge of leased premises was open and obvious); *Fitch v. Selwyn Village, Inc.*, 234 N.C. 632, 68 S.E.2d 255 (1951) (duty to guard and warn children was parents'); *Roberson v. City of Kinston*, 261 N.C. 135, 134 S.E.2d 193 (1964) (following *Fitch*); *John Aragona Enterprises, Inc. v. Miller*, 213 Va. 298, 191 S.E.2d 804 (1972) (defect was not hidden or latent and was not created by landlord). Nevertheless, we find the reasoning of these decisions to conflict with Arizona law as expressed in *Markowitz*. We hold that a landlord's duty to his tenants is not as a matter of law circumscribed by the physical boundaries of the landlord's property.

Contrary to the Landlord's argument, *Coburn v. City of Tucson*, 143 Ariz. 50, 691 P.2d 1078 (1984), does not require a contrary result. In that case, a seven-year-old boy, riding his bicycle on the wrong side of the street, proceeded into an intersection without stopping and was killed when a car struck him. The boy's parents contended that the city's duty to keep its streets reasonably safe for travel included a duty to remove a bush that allegedly obstructed visibility at the intersection. Affirming the existence of the city's duty to travelers, our supreme court held nonetheless that under the particular facts of

that case, as a matter of law, the duty had not been breached.

In noting that some cases might present a question regarding the existence of a duty, the court acknowledged the rule that a possessor of land that abuts a public highway has no common law duty to use or refrain from using his land so as to protect members of the traveling public on abutting streets. This principle, however, has no application to the case before us, where the pivotal relationship is not that between a possessor of land and a traveler on an abutting street, but that of a landlord and his tenant. As we have explained above, Arizona law imposes a duty upon the landlord to exercise reasonable care for the safety of his tenants in light of the known and foreseeable risks.

We also reject the Landlord's assertion that to hold in favor of the Udys on the issue of duty would be to impose on every owner of land adjacent to a public street the duty to construct a fence or wall to prevent access to the street. The *Markowitz* court rejected a similar argument as follows:

> In casting the question in terms of the existence or non-existence of a duty to take specific steps, the court of appeals assumes that any duty found to exist would necessarily be absolute.... Such an interpretation of the concept of duty is incorrect.
>
> ... [D]etails of conduct bear upon the issue of whether the defendant who does have a duty has breached the applicable standard of care and not whether such a standard of care exists in the first instance.

146 Ariz. at 355, 706 P.2d at 367. Our holding that the Landlord owed a duty of care to Georgie Udy does not entail a holding that the Landlord had a "duty" to fence the Udys' yard or to engage in any other specific conduct.

*Compliance with Duty as a Matter of Law.*

Alternatively, the Landlord argues that if it owed a duty of care to Georgie, the duty was fulfilled as a matter of law. Under *Markowitz*, maintains the Landlord, it

could meet its duty of care either by making the premises safe or by warning Georgie about the danger. The Landlord then urges that it complied with the "warning" requirement as a matter of law because the traffic hazard was so obvious that additional warnings would have made no difference.

We cannot agree. First, *Markowitz* refers to "warning" or "removing the danger" as examples within the general range of conduct that might satisfy the defendant's duty of care under the circumstances of the particular case before the court. *See* 146 Ariz. at 356–57, 706 P.2d at 368–69. *Markowitz* does not stand for the proposition that a warning will be sufficient in every case no matter what the circumstances. Indeed, that proposition is at odds with the supreme court's consistent rejection of the practice of equating the concept of duty with specific details of conduct. *See id.* at 355, 706 P.2d at 367.

■ Second, although the open and obvious nature of a defect or hazard is one factor to be considered in determining whether a defendant was negligent, it is not necessarily determinative.

> [T]he possibility that the defect or hazard is "open and obvious" is a factor to be considered in determining whether the possessor's failure to remedy the hazard or provide a warning was unreasonable and therefore breached the standard of care.... [W]here the possessor should foresee that the condition is dangerous despite its open and obvious nature, neither the obvious nature nor the plaintiff's knowledge of the danger is conclusive.

*Markowitz*, 146 Ariz. at 356, 706 P.2d at 368. *See also Terranova v. Southern Pacific Transportation Company*, 158 Ariz. 125, 761 P.2d 1029 (1988) (where plaintiff was injured when she drove into a stationary freight train blocking the street, with warning lights and bells operating, question of railroad's negligence was for jury); *Murphy v. El Dorado Bowl, Inc.*, 2 Ariz. App. 341, 409 P.2d 57 (1965) (recessed walkway in bowling alley might have been obvious to a person walking normally, but likely to be forgotten by a contestant in the excitement of a game).

■ Whether the Landlord acted in accordance with its duty to Georgie is a question that must be answered within the context of all of the facts and circumstances of this case, including Georgie's age and the known propensity of young children to engage in lively activity. Our supreme court has stated:

> The characteristics of children are proper matters for consideration in determining what is ordinary care with respect to them, and there may be a duty to take precautions with respect to those of tender years which would not be necessary in the case of adults. The duty is to exercise such care as a reasonable prudent person would exercise toward children under like circumstances.

*Shannon v. Butler Homes, Inc.*, 102 Ariz. 312, 317, 428 P.2d 990, 995 (1967). Other relevant circumstances include the close proximity of the Udys' lot to a busy street with a 45 m.p.h. speed limit, a lease that expressly reserves to the Landlord the right to control tenants' ability to protect their children by fencing their lots, and the Landlord's repeated refusal to permit the Udys to build a fence. Considering all of these circumstances, we conclude that reasonable people might differ as to whether the Landlord fulfilled its duty to take such precautions as a reasonably prudent person would take for Georgie's safety in light of the known and foreseeable risks.

Accordingly, the summary judgment is reversed, and this matter is remanded to the trial court for proceedings consistent with this opinion.

JACOBSON, Presiding Judge, specially concurring.

I specially concur, because, in my opinion, the lead opinion extends the duty arising out of a landlord/tenant relationship beyond legally recognized limits. The principles stated may well define the duties of a possessor of land. They do not express the duties recognized in the landlord/tenant situation.

To put this matter in proper legal context, it is necessary to revisit what the common law says happens when property is leased. This is well stated in the introductory statements to Topic 3, "Liability of Lessors of Land to Persons on the Land," *Restatement (Second) of Torts* § 356 comment a, at 240 (1965):

> When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the land for the term of the lease. The lessee acquires an estate in the land, and becomes for the time being the owner and occupier, subject to all of the liabilities of one in possession, both to those who enter the land and to those outside of it. Therefore ... it is the general rule that the lessor is not liable to the lessee, or to others on the land, for injuries occurring after the lessee has taken possession, even though such injuries result from a dangerous condition existing at the time of the transfer.

Thus, the landlord was generally held immune from tort liability. W. Prosser and W. Keeton, *The Law of Torts*, § 63 at 434 (5th ed. 1984) (hereafter, "Prosser and Keeton"); Boyer, *Survey of the Law of Property*, § 202 (3rd ed. 1981). The tenant acquired an estate in the leasehold that conveyed not only possession but also control. Prosser and Keeton, *supra*. The general rule was that in the absence of an express contractual provision, a tenant took the premises as he found them. *Id.*, *see also Cummings v. Prater*, 95 Ariz. 20, 386 P.2d 27 (1963). In *Cummings*, however, the Arizona Supreme Court recognized that modern social policy considerations and Arizona precedent compelled the conclusion that certain exceptions should be carved out from the general rule. 95 Ariz. at 25, 386 P.2d at 30. The court therefore held that the landlord was under a duty to inspect the premises and "to take those precautions for the safety of the tenant as

would be taken by a reasonably prudent man under similar circumstances." 95 Ariz. at 26, 386 P.2d at 31. Arizona is also within the majority of jurisdictions that imposes a statutory duty on landlords to maintain fit premises in general and specifically on landlords of mobile home parks. *See* A.R.S. § 33–1434. This extension of liability, however, does not compel the conclusion that the landlord's duty extends beyond the leased premises as a matter of law.

To support its contention that a landlord is liable to his tenant for off premises dangers, the lead opinion focuses on the foreseeability of the harm suffered in this case. It rejects the proposition that the landlord is under no duty to protect a tenant from off premises dangers claiming that neither *Markowitz* nor its predecessors "held that the geographic limits associated with a particular relationship necessarily delimit the scope of any duty of care imposed upon the parties to the relationship." Maj. op. at 1059–60. My reading of the cases cited is to the contrary. In *Markowitz*, the injury occurred on state property in which the defendant/state had dominion and control over the site of the accident. Similarly, in both *Beach v. City of Phoenix*, 136 Ariz. 601, 667 P.2d 1316 (1983), and *Coburn v. City of Tucson*, 143 Ariz. 50, 691 P.2d 1078 (1984), the defendant/city had the duty to keep *its* streets reasonably safe for travel. Lastly, in *Tribe v. Shell Oil Co.*, 133 Ariz. 517, 652 P.2d 1040 (1982), the accident occurred on the proprietor's property and the issue that made summary judgment inappropriate was whether the danger was open and obvious and not whether the proprietor had a duty in the first instance. I find no authority in these cases for the proposition that, as a general rule, a landlord's duty to his tenant should be co-extensive with that of a possessor of land or extended to off-premises dangers.[1] Foreseeability is not the

---

1. A *possessor* of land may be liable for off-premises liability. Prosser and Keeton, *supra*, at § 57. Such liability, however, is predicated on the ability the possessor has to control the manner in which he uses the premises. *Id.* Although the possessor has a right to make use of the land for his own benefit, that right is qualified by "principles of reasonableness, so as to cause no unreasonable risks of harm to others in the vicinity." *Id.* at 386. A possessor's duty in this situation arises as a matter of law so that even a tenant may be held liable if he controls

issue. The issue is: even if the harm is foreseeable—that Georgie would be struck by a car in a busy street adjacent to his home—does the landlord have a duty to take measures to prevent that injury as a matter of law?

The lead opinion relies on the Montana case, *Limberhand v. Big Ditch Co.,* 706 P.2d 491 (Mont.1985). In *Limberhand,* a small child wandered across a parking lot of an apartment complex that was adjacent to an open irrigation ditch. The child fell in the ditch and drowned. The owner/landlord of the apartment complex controlled the parking lot. The Montana court predicated its finding that the landlord had a duty to use reasonable care in protecting a social guest or tenant of the apartment complex from off-premise dangers, on the landlord's retained control of common areas in the apartment complex and not on any duties arising from the basic landlord/tenant relationship. *Limberhand,* 706 P.2d at 498 ("It is well-settled law in Montana that the social guest of a tenant in the common areas of an apartment complex is afforded a degree of protection from harm in relation to the duty of a landlord."). A different analysis obtains when the landlord relinquishes control of the premises to the tenant. In my opinion, *Limberhand* does not support the reasoning the majority employed in this case.

While acknowledging the salutary effect of the growth of law in regard to the landlord/tenant relationship, I am constrained to conclude that the changes have not undermined the basic proposition that any duty imposed on the landlord must be defined by the original contractual agreement between the landlord and the tenant. I would therefore hold that the landlord/tenant relationship imposes on the landlord only a duty to prevent harm *on* the premises, unless the landlord controls the tenant's ability to protect himself from off-premise dangers.

The parties have stipulated, for the purpose of this summary judgment, that the

absence of a fence was the proximate cause of Georgie's injuries. In the lease between the parties, the landlord reserved to himself the decision to allow or not allow fencing on the property. The record, at least for the purpose of summary judgment, shows that the tenants requested that they be allowed to erect fencing to protect against the precise danger that resulted in Georgie's injuries. The landlord refused. When a party contractually places himself in a position to control a risk that can give rise to bodily harm, that party assumes the duty to exercise that control with reasonable care. *See Restatement (Second) of Torts* § 357; Prosser and Keeton, *supra,* at 443 (majority of courts impose tort liability for injuries to person or property when landlord contractually agrees to keep premises in repair, finding a duty arising out of the contract relation); *see also Mobil Oil Corp. v. Thorn,* 401 Mich. 306, 258 N.W.2d 30 (1977) (citing growing trend toward holding lessor liable in tort from injuries resulting from lessor's failure to perform under a convenant to make repairs.).

This duty arises out of control, as defined by the contract, and cannot be generally extended to all aspects of the landlord/tenant relationship. Under the circumstances here, a jury question is raised as to whether the landlord exercised due care in the contractual control he reserved to himself.

I therefore concur that this case must be reversed.

GERBER, Judge, specially concurring.

I write specially because my position falls between that of Judges Brooks and Jacobson but is closer to that of Judge Brooks.

In the first place, this is a case about duty to protect from a danger (traffic) outside the leased premises. In that respect, it is a case of first impression in Arizona. We ought to acknowledge that. Secondly,

---

the activities on the premises without the landlord's consent. *Id.* at 437. This duty is not analogous to the duty imposed by the landlord/tenant relationship which is defined at its

inception by a contractual agreement and which must be applied with the development of the common law exceptions to the principle of *caveat emptor* in mind.

we ought to acknowledge that the major Arizona cases cited—*Markowitz, Cummings,* and *Bach*—deal with liability for *on* premises dangers. True, their duty language is broad and non-geographical, but none of these cases is automatic authority for the existence of a duty regarding dangers *outside* the leased premises.

To begin the analysis it is essential to first distinguish the existence of a legal duty from the existence of the ready remedy, the fence. Focusing first on the fence and the ease with which it could have prevented this tragic injury begs the question. The threshold question is whether there was any duty of care in the first place. If that question is answered in the negative, the fencing issue need not be raised.

The question of duty is one of law to be decided by the court, *Markowitz v. Arizona Parks Board,* 146 Ariz. 352, 354, 706 P.2d 364–366 (1985). In discussing duty, that court stated:

> [T]he question is whether the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff. If the answer is no, the defendant is not liable even though he may have acted negligently in light of the foreseeable risks.

*Id.*

The relationship question precedes the remedy question. *Coburn v. City of Tucson,* 143 Ariz. 50, 691 P.2d 1078 (1984) points up the problem in approaching this case initially in terms of the contractual provision dealing with fencing:

> [T]he problems of "duty" are sufficiently complex without subdividing it ... to cover an endless series of details of conduct. It is better to reserve "duty" for the problem of the relation between individuals which imposes upon one a legal

obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, "duty" is a question whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases the "duty" [if it exists] is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty....

143 Ariz. at 52, 691 P.2d at 1080, quoting W. Prosser and W. Keeton, *Law of Torts* § 53 at 356 (5th ed. 1984). The focus of analysis must initially be not on the remedy but on the *relationship* between the parties.

With these principles in mind, and particularly in view of the *Cummings* language cited by Judge Brooks, I conclude that Arizona law imposes a duty of care on a landlord with respect to his tenants, and that that duty is not *a priori* limited by property boundaries but, instead, is defined by the legal and factual *relationship* between the individual landlord and tenant. That the traffic danger here lies just outside the leased premises is irrelevant to this threshold determination. Here there are two unique things about the relationship between this landlord and these tenants: First, one of the tenants, Georgie, was a small child[1] not able to protect himself as an adult. Secondly, unlike many other leases, the landlord here retained to himself the power to erect a fence. These two aspects of the relationship between the parties define the landlord's duty of care in this situation to embrace (among other duties) a duty to care for a minor tenant denied the protection of a fence. This conclusion does not mean that the landlord had

---

1. At least two Arizona cases involving child plaintiffs have based their analyses on the duty owned by a landlord to a child tenant. In *Presson v. Mountain States Properties, Inc.,* the plaintiff was a nine-year-old who was burned by a faulty water heater. 18 Ariz.App. at 177, 501 P.2d at 18. This court held that the landlord owed the child the duty previously set forth in *Cummings. Id.* at 178–79, 501 P.2d at 19–20. No distinction was made between the duty owed

her, as opposed to the duty owed her father, the signator on the lease. *Id.* Similarly, the injured twelve-year-old plaintiff in *McFarland v. Kahn* was owed the same duty as that owed a tenant. 123 Ariz. 62–63, 597 P.2d 544–45. The landlord's duty, then, is to exercise such care as a reasonably prudent person would exercise toward tenant children under similar circumstances.

a duty to erect a fence; it means that the landlord had a duty to protect a minor tenant denied the protection of a fence. The existence of this duty of care derives from the relationship between the individual parties, not from considerations of traffic or geography.

The fact that one of the tenants, Georgie, is a small child refines the duty of care with particularity. The characteristics of children are proper matters for consideration in determining what is ordinary care with respect to them, and there may be a duty to take precautions with respect to those of tender years which would not be necessary in the case of adults. The landlord's duty is to exercise such care as a reasonably prudent person would exercise toward children under like circumstances. *Shannon v. Butler Homes, Inc.,* 102 Ariz. 312, 317, 428 P.2d 990, 995 (1967).

Once the landlord's duty is found and described, the next question becomes its scope, i.e. the foreseeability of injury. Elaborating on how foreseeability fits into the duty analysis, this court has previously stated:

> This issue is to be presented to the jury, however, where there is a debatable question as to whether the injury to the plaintiff was within the foreseeable scope of the risk and whether the defendant was required to recognize the risk and take precautions against it.

*Schnyder v. Empire Metals, Inc.,* 136 Ariz. 428, 431, 666 P.2d 528, 531 (App.1983).

Foreseeability of injury turns on factual and contractual provisions dealing, among other things, with fencing, because fencing, among other matters, determines the likelihood of injury. The parties defendant have stipulated that the absence of a fence was the proximate cause of the injury. Taking this concession at its face value means that the foreseeability of injury becomes much greater by the absence of a fence, particularly where the tenants' use of the leasehold is restricted by the landlord's retention of exclusive authority over fencing. As in the *Limberhand* case cited in Judge Brooks' opinion, the landlord, not the tenant, thereby retains the power to

control to some extent the off-premises danger. While there is nothing contractually defective about this reservation of fencing authority to the landlord, the landlord's duty of care requires him to exercise his fencing decisions as a reasonably prudent person would do in a relationship between these same parties in the same situation.

Defendant urges two objections to this analysis: first, the duty to care for Georgie resides in the parents, not the landlord, and second, the open and obvious character of the traffic danger precludes any liability to the landlord.

As to the first, the existence of a parent-child relationship does not negate but merely complements the landlord-tenant relationship. The mere fact that a child resides with parents does not relieve a landlord from the duty of care described above, primarily because the landlord, not the parents, has the more direct control over the lease.

As to the second objection, whether the unfenced yard and adjacent traffic constitute an open and obvious condition is inappropriate to resolve as a matter of law. While a patently open and obvious condition may justify summary judgment in an undebatable case, e.g., *Robles v. Severyn,* 19 Ariz.App. 61, 504 P.2d 1284 (1973), the question here is not whether the condition and its dangerousness were open and obvious to plaintiff's parent, but to the minor tenant, Georgie. As *Cummings v. Prater* stated:

> The open and obvious condition is merely a factor to be taken into consideration in determining whether the condition was unreasonably dangerous.

95 Ariz. at 27, 386 P.2d at 31. A parallel factual situation arose in *Schultz v. Eslick,* 788 F.2d 558 (9th Cir.1986). In *Schultz,* a three-year-old child in a leased residence suffered severe injuries when she fell into an unfenced pool. Construing Arizona law, the court noted the nature of a landlord's duty as set forth in *Cummings,* and further held that the open and obvious nature of the dangerous aspects of a swimming pool would not automatically relieve a landlord of liability to the child. That court stated:

No Arizona decision appears to have decided whether an unfenced residential pool is unreasonably dangerous to a three-year-old child as a matter of law. We believe that the liability question should be sent to an Arizona jury because reasonable minds could differ on whether the unfenced pool was unreasonably dangerous to small children.

*Id.* at 559–60. The court also pointed out that the proper inquiry was whether the landlords satisfied their duty of care to the three-year-old plaintiff, not to her parents. The character or age of the victim must be considered in determining whether the open and obvious danger terminates the duty of care.

In sum, the determination of the duty here is a question of law flowing from the relationship of this lessor and these lessees, in particular a minor tenant unable to protect himself as an adult. The decision to fence or not to fence flowing from the contractual provisions in the lease is to be measured by a jury on a "reasonably prudent person" standard where the reasonably prudent person faces the same circumstances, same parties, and the same relationship of care as existed here. Accordingly, I agree that the summary judgment must be reversed and this matter resolved by a jury.