IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

DIANNAH DINSMOOR,
*Plaintiff/Appellant,*

*v.*

CITY OF PHOENIX, A MUNICIPAL CORPORATION; DEER VALLEY UNIFIED
SCHOOL DISTRICT NO. 97 OF MARICOPA COUNTY, A POLITICAL
SUBDIVISION OF THE STATE OF ARIZONA; LYNN MILLER AND JANE DOE
MILLER, HUSBAND AND WIFE; KIMBERLY HEINZ AND JOHN DOE HEINZ,
HUSBAND AND WIFE; KENNETH PALMER AND JANE DOE PALMER, HUSBAND
AND WIFE,
*Defendants/Appellees.*

No. CV-20-0214-PR
**August 6, 2021**

Appeal from the Superior Court in Maricopa County
The Honorable David B. Gass, Judge (Ret.)
No.   CV2015-001448
**AFFIRMED**

Opinion of the Court of Appeals, Division One
249 Ariz. 192 (App. 2020)
Filed June 30, 2020
**VACATED IN PART**

COUNSEL:

Bradley R. Jardine (argued), Michael Warzysnki, Jardine, Baker, Hickman
& Houston, P.L.L.C., Phoenix, Attorneys for Deer Valley Unified School
District No. 97, Lynn Miller, and Kimberly Heinz

David L. Abney (argued), Ahwatukee Legal Office, P.C., Phoenix; Ryan
Skiver, The Skiver Law Firm, Scottsdale, Attorneys for Diannah Dinsmoor

Lynne C. Adams, Eric M. Fraser, Hayleigh S. Crawford, Osborn Maledon, P.A., Phoenix, Attorneys for Amici Curiae Arizona Charter Schools Association, Arizona School Boards Association, and Arizona School Risk Retention Trust

———————————

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which JUSTICES BOLICK, LOPEZ, BEENE, MONTGOMERY, and PELANDER (RETIRED)* joined.**

———————————

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1 Matthew and Ana were sophomores at Sandra Day O'Connor High School in the Deer Valley Unified School District when they began dating. After the two became entangled in a dispute at school involving Matthew's ex-girlfriend, Ana agreed to meet Matthew after school at a friend's home to talk matters over. While there, Matthew shot and killed Ana and then killed himself. School personnel knew that Ana planned to meet Matthew that day. They also knew that Matthew had been violent with his ex-girlfriend and had possibly threatened her the previous day. Regardless, they did not take any action to protect Ana. The issue before us is whether the school owed Ana a duty of care. We hold it did not owe her a duty under the circumstances here.

## BACKGROUND

¶2 Matthew and Ana were in a dating relationship before breaking up during the fall of 2013. Matthew then began dating Raven. During their relationship, Matthew told Raven that Ana had been making

---

* Chief Justice Brutinel is recused from this matter. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Ret.), of the Arizona Supreme Court, was designated to sit in this matter.

** Justice Andrew W. Gould (Ret.) announced his retirement from the Court before the oral argument in this case. He did not participate in deciding the case or in drafting this opinion.

derogatory remarks about her. Raven broke up with Matthew in January 2014.

¶3 Soon after their break-up, Matthew taunted Raven at school, and she responded by slapping his face. Matthew retaliated by shoving her to the ground and shaking her. Consequently, the school suspended Raven for five days and suspended Matthew for three days. Matthew did not have any other disciplinary incidents while attending the school.

¶4 Matthew and Ana started dating again, and Matthew told her that Raven had been making derogatory comments about her. On March 5, Ana heard that Raven wanted to hire someone to beat up the couple. Ana approached Raven during lunch at school, and in the ensuing conversation Raven denied harboring ill feelings toward Ana or intending to hurt her. The girls compared notes and concluded that Matthew had been attempting to play them against each other so they would fight over him. According to Raven, Ana was livid and immediately walked over to Matthew, who had been watching, and yelled at him.

¶5 The next day, March 6, Matthew texted Ana, "We'll take care [sic] it when she's walking home from the bus," and "I'll see to it that this stops." Alarmed, Ana warned Raven in a school bathroom that Matthew planned to hurt her. According to Raven, Ana also said Matthew had texted, "I've got a gun. I know where she lives." (Raven never saw the texts, and they did not, in fact, refer to a gun or Raven's home.)

¶6 Raven was understandably distressed and reported Ana's warning to school authorities. Vice principal Kimberly Heinz investigated by speaking separately with Raven and Ana and then reviewing the text messages. Because Matthew was not at school that day, Heinz did not speak with him but planned to do so the next morning. Heinz thought the texts were "very vague," but both Ana and Raven stated Matthew might be planning to hit or hurt Raven because he had done so previously. Heinz also learned that Raven had dated Matthew, Ana was currently dating him, and the girls had just discovered he was pitting them against each other. Ana expressed worry only for Raven, not herself.

¶7 Considering Ana and Raven's concern, Heinz asked for input from school safety officer Kenneth Palmer, an off-duty City of Phoenix Police Officer. Ana told Palmer she thought Matthew was "crazy," but she did not feel personally threatened by him. Raven repeated her belief

3

that Matthew would harm her. Palmer concluded the texts were not threatening.

¶8        Heinz implemented a safety plan for Raven, which included informing Raven's mother of the situation, switching Raven from her classes with Matthew, having a security monitor walk her to the bus, and verifying that someone would pick up Raven from her bus stop. Heinz also informed principal Lynn Miller about the possible threat towards Raven and the plan to protect her. Believing the only potential threat was aimed at Raven, Heinz did not implement a safety plan for Ana.

¶9        March 7 was an early-release day. Heinz checked attendance and discovered Matthew was not on campus, so she could not speak with him as planned. Nonetheless, several students reported rumors to Palmer that Matthew was on campus with a gun. Palmer investigated but concluded the rumors were false. Matthew was absent from all his classes, and Palmer could not locate anyone who had seen Matthew that day. A security monitor searched the hallways and restrooms but could not find Matthew. And immediately before school recessed, Matthew's mother informed Palmer that Matthew had stayed home that day.

¶10        That same morning, Ana told Heinz that Matthew wanted to meet with her after school. Ana said Matthew did not pose any threat to her, and Heinz urged her to "make good choices." Ana also told Palmer she was going to a friend's house after school to see Matthew. Palmer warned her it "was not a good idea" but took no action. Ana went to her friend's house, where Matthew shot and killed her and then himself.

¶11        Ana's mother, Diannah Dinsmoor, sued Heinz, Palmer, Miller, the Deer Valley Unified School District, and the City of Phoenix, alleging negligence-based claims. The trial court entered summary judgment for all defendants, reasoning they did not owe a duty to protect Ana under the circumstances. The court of appeals affirmed summary judgment for the City but reversed as to the remaining defendants. *Dinsmoor v. City of Phoenix*, 249 Ariz. 192, 201 ¶ 40 (App. 2020). The court concluded that the District and its agents "owed Ana a duty based on the special relationship between a school and its students." *Id.* at 197 ¶ 23. Because an issue of material fact existed whether Palmer was acting as an agent of the District, the court determined he was also not entitled to summary judgment. *Id.* at 201 ¶ 39.

4

¶12 The District, Heinz, and Miller (collectively, "the District") petitioned for review. Palmer did not. We granted review to clarify the duty owed by schools to their students, a recurring issue of statewide importance.

## DISCUSSION

### I. Standard of review

¶13 We review the entry of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. *Glazer v. State*, 237 Ariz. 160, 167 ¶¶ 28–29 (2015). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a).

### II. The school-student duty

### A. General principles

¶14 To prevail on her claims, Dinsmoor must establish that the District owed a duty to Ana to conform to a particular standard of conduct to protect her against unreasonable risks of harm. *See Gipson v. Kasey*, 214 Ariz. 141, 143 ¶¶ 9–10 (2007). Duties are based on "special relationships" or on relationships formed by public policy. *See Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 565 ¶ 14 (2018). Special relationships include those recognized at common law and those formed by contracts, joint undertakings, and family relationships. *See id.*; *Stanley v. McCarver*, 208 Ariz. 219, 221 ¶ 7 (2004). "The special relationship imposes a duty to avoid harm from 'risks created by the individual at risk as well as those created by a third party's conduct.'" *Nunez v. Prof'l Transit Mgmt. of Tucson, Inc.*, 229 Ariz. 117, 121 ¶ 17 (2012) (quoting Restatement (Third) of Torts: Liability for Physical Harm § 40 cmt. g (Am. Law Inst. Proposed Final Draft No. 1 2007)). Whether a duty exists is a legal issue we determine de novo. *See Quiroz*, 243 Ariz. at 564 ¶ 7.

¶15 The parties here agree that any duty owed by the District to Ana is grounded on the common law special relationship between a

primary or secondary school and its students.[1]  *See Jesik v. Maricopa Cnty. Cmty. Coll. Dist.*, 125 Ariz. 543, 546 (1980) (recognizing this duty).   People do not generally have a duty to protect others from harm.  *See Quiroz*, 243 Ariz. at 573–74 ¶¶ 62–63; *Lips v. Scottsdale Healthcare Corp.*, 224 Ariz. 266, 269 ¶ 14 (2010).   Nevertheless, the school-student relationship imposes an affirmative duty on schools to protect students from unreasonable risks of harm.  *See Hill v. Safford Unified Sch. Dist.*, 191 Ariz. 110, 112 (App. 1997) (acknowledging that schools have a statutory and common law duty "not to subject students within their charge" to "unreasonable risk[s] of harm through acts, omissions, or school policy"); *see also Jesik*, 125 Ariz. at 546 (noting that a college has duties to make its premises reasonably safe and to protect students from torts).   The duty imposed recognizes that the school "is a custodian of students, it is a land possessor who opens the premises to a significant public population, and it acts partially in the place of parents."   Restatement (Third) of Torts: Liability for Physical Harm § 40 cmt. l (Am. Law Inst. 2012).

**¶16**        The parties disagree whether the school-student duty is limited by time and place considerations.   The District argues the duty exists only when a student is endangered while attending school during school hours or participating in off-campus, school-sponsored activities.  Dinsmoor counters the duty exists regardless of where and when the student suffers injury if the school learned of an unreasonable risk of harm to the student while the school exercised custody and control over her.

**¶17**        Our view of the school-student duty falls between the parties' positions.   A school's duty to its students is not limitless.  *See Monroe v. Basis Sch., Inc.*, 234 Ariz. 155, 157 ¶ 6 (App. 2014).   A duty based on special relationships, including the school-student relationship, applies only to "risks that arise within the scope of the relationship."   *See Boisson v. Ariz. Bd. of Regents*, 236 Ariz. 619, 623 ¶ 10 (App. 2015) (quoting Restatement § 40(a) (2012)).   Generally, the scope of such relationships is "bounded by

---

[1]  Schools may also owe duties grounded on statutes or bases other than the school-student relationship.  *See Alhambra Sch. Dist. v. Superior Court*, 165 Ariz. 38, 41–43 (1990) (holding that a school owed statutory and common law duties to all persons using marked crosswalk that it voluntarily established).   Here, we address only the duty arising from the special relationship between primary and secondary schools and their students.

geography and time." *See* Restatement § 40 cmt. f (2012) ("The duty imposed in this Section applies to dangers that arise within the confines of the relationship and does not extend to other risks."). Thus, in the school-student relationship, the duty "encompass[es] risks such as those that occur while the student is at school or otherwise under the school's control." *Monroe*, 234 Ariz. at 157–58 ¶ 6 & n.2 (citing Restatement § 40(b)(5) and cmts. f, l (2012)).

**¶18** *Monroe* illustrates the confines of the school-student relationship. There, the court of appeals held that a charter school did not owe a duty of care to Jennifer, an eleven-year-old student who was struck by a truck as she rode her bicycle home from school. *Monroe*, 234 Ariz. at 156 ¶¶ 1–2. The court reasoned that "[w]here a duty arises from a special relationship, the duty is tied to expected activities within the relationship" and in the school-student relationship, "the duty of care is bounded by geography and time, encompassing risks such as those that occur while the student is at school or otherwise under the school's control." *Id.* at 157–58 ¶ 6 (citing Restatement § 40(b)(5) and cmts. f, l (2012)). Because Jennifer had left the school's custody when riding home, the school "did not have a protective obligation and lacked the special, school-student relationship" when the accident occurred. *See id.* at 158 ¶ 9. The court therefore concluded that even though the school was near a busy intersection, it did not owe Jennifer a duty of care to protect her traveling to and from school. *See id.* at 158–59 ¶¶ 9–10; *see also Pratt v. Robinson*, 349 N.E.2d 849, 854 (N.Y. 1976) ("We see no basis, either in statutes or common law, for the creation of a school's duty to protect its students from hazards which may [beset] them once they are on their way home and outside the control of the school.").

**¶19** The court of appeals' opinion in *Hill* conflicts with *Monroe* by suggesting that the school-student duty is more expansive. The *Hill* court held that a high school and a teacher were not liable as a matter of law for student Clint's death, which occurred when another student, Scott, shot Clint after school and off-campus. 191 Ariz. at 111, 117. Clint and Scott had argued earlier that day at school before an associate principal intervened and sent the boys to class. *See id.* at 111–12. Clint's mother sued, citing circumstances from which the school and the teacher "knew or should have known that [Scott] had dangerous propensities [and] it was foreseeable that [Scott] would harm or cause injury to [Clint]" after the argument that day. *See id.* at 111. Without analysis, the court agreed that the school-student relationship imposed a duty on the school "to take

reasonable precautions for [Clint's] safety." *See id.* at 112. But it ultimately concluded the school had not breached that duty "[b]ecause [Clint's] death was not reasonably foreseeable and did not result from an unreasonable risk created by the school or [the teacher]." *Id.* at 117.

**¶20** We are persuaded by *Monroe*'s more limited view of the school-student duty and reject *Hill* on that point. Because the school's roles forming the basis for the duty—custodian, land possessor, and quasi-parental figure—apply when the school supervises and controls students and their environment, enabling it to identify and eliminate risks, we are convinced the duty to protect students exists only while the school is fulfilling these roles. But once students safely leave the school's control, the special relationship ends, and students are simultaneously released to their parents' or guardians' full custodial care. At that point, the school is relieved of any duty to affirmatively protect students from any hazards they encounter. Thus, in *Hill*, neither the school nor the teacher owed any duty to protect Clint from Scott once the boys safely left the school's control, and to the extent *Hill* suggests otherwise, we disapprove it.

**¶21** Other courts concur with our view. *See, e.g.*, *Pratt*, 349 N.E.2d at 852 (reasoning that a school's duty is "coextensive with and concomitant to its physical custody of and control over the child," and when that child passes from "the orbit of its authority," the school's custodial duty ceases); *Norton v. Canandaigua City Sch. Dist.*, 624 N.Y.S.2d 695, 697, 699 (N.Y. App. Div. 1995) (concluding that "a school district's duty to a student, unlike a parent's duty to a child, is strictly limited by time and space" and whether a child should cross a street to await a school bus "is a decision for a student or parent to make, not a school"); *Davis v. Lutheran S. High Sch. Ass'n of St. Louis*, 200 S.W.3d 163, 168–69 (Mo. App. 2006) (deciding school did not owe a duty to high school students killed while driving to school softball game held during school hours because it lacked authority and control over the students' mode of travel); *Young v. Salt Lake City Sch. Dist.*, 52 P.3d 1230, 1233 (Utah 2002) ("[W]hen a school district lacks custody, it has no protective obligation and no special relationship exists.").

**¶22** We decline, however, to draw a bright-line rule barring recognition of the school-student duty whenever the student suffers harm while outside the school's supervision and control, although that may usually be the case. *See* Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 418 (2d ed. 2011) ("Injury generated outside the school

property, outside of curricular or extra-curricular activities, and from sources unconnected to the school, is not likely to be the school's responsibility."). Our courts have refused to draw such lines in cases involving duties grounded in other special relationships, and no reason appears why we should do so in the school-student context. *See Stephens v. Bashas' Inc.*, 186 Ariz. 427, 430–31 (App. 1996) (concluding that a grocer owed a duty to an invitee-driver injured while opening delivery truck doors on adjacent public street because businesses have a duty to provide a reasonably safe means of ingress and egress for invitees and the grocer knew drivers used that area for parking and opening doors before backing onto its property to deliver goods); *Udy v. Calvary Corp.*, 162 Ariz. 7, 11 (App. 1989) (stating that a landlord owed a tenant-child a duty and the fact the child was injured when he ran into a busy road next to the unfenced premises was relevant only to whether the landlord breached the standard of care).

¶23 Unique circumstances may exist where a school has a duty to protect students from risks that arise while under school supervision and control even though such risks result in harm when students are outside school supervision and control. For example, in *Warrington v. Tempe Elementary School District No. 3*, the court of appeals stated that a district owed a duty of care to a seven-year-old student injured while walking home from a bus stop located on a heavily travelled street. 187 Ariz. 249, 253 (App. 1996). The court reasoned that in deciding where to place bus stops, the district had a duty not to subject students to an unreasonable risk of harm. *See id.*; *see also Garrett v. Grant Sch. Dist. No. 124*, 487 N.E.2d 699, 703 (Ill. App. 1985) (to same effect). Similarly, a school's duty to provide a reasonably safe means of ingress and egress does not evaporate if a student is injured off campus while trying to enter school property to attend classes. *See Stephens*, 186 Ariz. at 430–31. And if a threat of harm exists for students leaving school for the day—an active shooter in the neighborhood or a tornado, for example—that risk arises within the school-student relationship, thereby imposing a duty on the school to protect students. *See Perna v. Conejo Valley Unified Sch. Dist.*, 192 Cal. Rptr. 10, 11–12 (Cal. Ct. App. 1983) (finding duty of on-premises supervision implicated where teacher kept student after school until after a crossing guard had left assigned intersection for the day and the student was injured there after leaving school); *Jerkins ex rel. Jerkins v. Anderson*, 922 A.2d 1279, 1288 (N.J. 2007) (recognizing existence of duty to supervise elementary students during dismissal in case involving nine-year-old student injured after he left school without an adult on an early dismissal day).

**¶24**      In sum, the school-student relationship creates a duty to protect students from unreasonable risks of harm arising within the confines of the relationship.   *See Boisson*, 236 Ariz. at 623 ¶ 10; Restatement § 40(a) (2012).   The key consideration is whether a known and tangible risk of harm arose that endangered the student while under the school's custody and control.   *See* Restatement § 40, cmt. l (2012).   In such scenarios, students are "deprived of the protection of their parents [or guardians]," and the school has an affirmative duty to protect them from such risks until they are safely released from the school's custody and control.   *See id.* § 40, Reporters' Note, cmt. l.

## B.   Application

**¶25**      Dinsmoor argues the District owed a duty to protect Ana because she was under its custody and control when she told Heinz and Palmer of her plans to meet with Matthew on the day of her death.   The court of appeals agreed, concluding "the District's obligation to Ana arose within the school-student relationship and required it to take appropriate actions—here, actions it could have taken while Ana was on campus during school hours—to protect her from the harm that ultimately occurred off campus, after school."   *Dinsmoor*, 249 Ariz. at 198 ¶ 25.

**¶26**      Dinsmoor's position is flawed by failing to consider whether the known and tangible risk of harm to Ana—that Matthew would physically hurt her—arose within the scope of the school-student relationship, which would impose a duty on the District to protect Ana. *See Monroe*, 234 Ariz. at 157–58 ¶ 6; *Boisson*, 236 Ariz. at 623 ¶ 10; Restatement § 40, cmts. f, l (2012).   A possible explanation for this omission stems from *Gipson*'s admonition that the existence of duty "is a legal matter to be determined *before* the case-specific facts are considered."   214 Ariz. at 145 ¶ 21.   But this language cautioned against considering the specific facts of the parties' relationship where a special relationship was absent.   *See id.* ¶¶ 19, 21 (noting the absence of a special relationship and reasoning that the parties' relationship as co-workers, friends, etc. was "a problematic basis for determining if a duty of care exists").   The Court similarly warned against "equat[ing] the concept of 'duty' with . . . specific details of conduct" as doing so would "conflate[] the issue with the concepts of breach and causation."   *Id*. (quoting *Coburn v. City of Tucson*, 143 Ariz. 50, 52 (1984)).

**¶27**      We do not understand *Gipson* as meaning a court cannot consider facts to determine whether a duty exists based on the presence of

an unreasonable risk of harm that arose within the scope of a special relationship. Logically, a court cannot determine whether a duty arises from such relationships unless it considers whether an unreasonable risk of harm arose while, for example, persons were patronizing an inn, riding a bus, or, here, attending school. *See* Restatement § 40(b) (2012) (listing special relationships). Identifying the risk within the scope of the special relationship does not touch on concepts of breach or causation, so there is no danger of conflating duty with those elements. *See Gipson*, 214 Ariz. at 145 ¶ 21; *see also Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 272 ¶¶ 33–35 (2021) (rejecting argument that court could not consider case-specific facts to determine as a matter of law that a defendant had not assumed a duty to plaintiff).

¶28            Nothing in the record suggests that Matthew posed a risk to Ana before she safely left the District's supervision and control on March 7. Assuming Matthew's text messages to Ana threatened harm, that threat was aimed only at Raven. Ana herself told Heinz and Palmer that Matthew did not pose a threat to her. Dinsmoor acknowledges that Ana was not directly threatened but nevertheless argues a threat existed because Matthew had previously been violent with Raven, and Ana and Matthew had recently argued. We reject this argument because it effectively injects foreseeability into the duty calculus, which this Court has repeatedly cautioned against. *See Quiroz*, 243 Ariz. at 563 ¶ 2 ("[F]oreseeability is not a factor in determining duty."); *Gipson*, 214 Ariz. at 144 ¶ 15 ("[F]oreseeability is not a factor to be considered by courts when making determinations of duty."). Because no evidence suggests Matthew posed a threat to Ana before she left school to meet him on March 7, a known and tangible risk of harm did not arise within the scope of the school-student relationship. The school consequently did not owe a duty to protect Ana from Matthew, and the trial court therefore correctly entered summary judgment for the District. Considering our holding, we do not address the parties' arguments concerning breach and causation.

## CONCLUSION

¶29            This is a tragic case, and we empathize with Dinsmoor for her great loss. Nevertheless, because the District did not owe a duty to Ana based on the school-student relationship, we affirm summary judgment for the District. We also vacate paragraphs 23–39 and the relevant portions of paragraphs 40–41 of the court of appeals' opinion.