576 So.2d 322 (1991)
HOLIDAY INNS, INC., Hospitality Venture, a Texas Joint Venture of Vista Management, Inc., a Texas Corporation, and Leisure Dynamics, Inc., a Texas Corporation, and the Insurance Company of North America, Appellants/Cross Appellees,
v.
Robert SHELBURNE, Lewis Friend, State Farm Insurance Co., Danny Mullin D/B/a Aristocrat Security Company, Lester Carter and Wayne Bennett, Appellees/Cross Appellants.
HOLIDAY INNS, INC., Hospitality Venture, a Texas Joint Venture of Vista Management, Inc., a Texas Corporation, and Leisure Dynamics, Inc., a Texas Corporation, and the Insurance Company of North America, Appellants/Cross Appellees,
v.
G. Julius RICE, As Personal Representative of the Estate of David Lamar Rice, Deceased, G. Julius Rice, Individually and Evelyn Rice, Individually, Lewis Friend State Farm Insurance Co., Danny Mullin D/B/a Aristocrat Security Company, Lester Carter and Wayne Bennett, Appellees/Cross Appellants.
Nos. 88-0592, 88-0593.
District Court of Appeal of Florida, Fourth District.
January 30, 1991.
Rehearing and Rehearing Denied April 10, 1991.
*324 Marjorie Gadarian Graham of Marjorie Gadarian Graham, P.A., West Palm Beach, for appellants/cross appellees.
John S. Shipley of Searcy, Denney, Scarola, Barnhart & Shipley, and Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach, for appellees/cross appellants.
Rehearing and Rehearing En Banc Denied April 10, 1991.

OPINION ON REHEARING
HERSEY, Chief Judge.
Appellants' motion for rehearing is granted and our original opinion is vacated and replaced by the following opinion.
These are two consolidated appeals from final judgments against appellants, defendants below, in two personal injury actions and a wrongful death action.
The injuries and the death resulted from an altercation between two groups of individuals who had been drinking at the Rodeo Bar in the Fort Pierce Holiday Inn.
One group was composed of the following couples: the Bennetts, the Smiths, the Carters, and the Parramores. The second group consisted of Robert Shelburne, Scott Turner, David Rice, Lisa Fuston, and others.
On the night of the incident the driver of the car carrying the latter group attempted to park at the Holiday Inn. A security guard prevented him from doing so. Consequently, he parked in the adjacent parking lot of Ingram's Fruit Stand, a business that was temporarily closed.
Both groups spent time in the Rodeo Bar, leaving at closing time. According to the record, as some individuals were moving toward their respective vehicles, they exchanged remarks and ultimately a fight erupted. The evidence shows that during the course of the physical combat Carter shot Turner, Rice, and Shelburne. Rice died from his wounds.
In the subsequent jury trial appellants were found liable and Turner was awarded $3,825,000 for his injuries, Shelburne received $1,000,000, and the Rice interests were awarded $1,000,000. The corporate defendants appeal. We turn our attention *325 first to appellants' contention that they were entitled to a directed verdict.

A. DEFENDANTS' MOTION FOR DIRECTED VERDICT
Generally, the proprietor of a place of public entertainment owes an invitee a duty to use due care to maintain the premises in a reasonably safe condition commensurate with the activities conducted thereon. Central Theatres, Inc. v. Wilkinson, 154 Fla. 589, 18 So.2d 755 (1944). Although not an insurer of a patron's safety, the proprietor of a bar or saloon is bound to use every reasonable effort to maintain order among the patrons, employees, or those who come upon the premises and are likely to produce disorder to the injury or inconvenience of patrons lawfully in the place of business. Stevens v. Jefferson, 436 So.2d 33 (Fla. 1983). The risk of harm must be foreseeable, and the determination of a breach of this duty depends on the facts of each individual case. Id.

1. Evidence Not Limited to Prior Similar Acts.

As the initial basis for their argument that the trial court erred in refusing to direct a verdict, appellants maintain that in order to impose a duty upon them, the appellees were required to prove that the appellants had actual or constructive knowledge of prior, similar criminal acts against invitees on their property. Appellants argue that they were not bound to anticipate criminal acts of third persons where, as in the present case, the wrongdoers were complete strangers to them and the victims, and the incident occurred precipitously and off appellants' property. Appellants point out that they are not insurers of the safety of appellees and as a matter of law are not liable for the consequences of Carter's criminal acts. In support of these propositions, appellants rely primarily upon Crown Liquors of Broward, Inc. v. Evenrud, 436 So.2d 927 (Fla. 2d DCA 1983), rev. denied, 447 So.2d 886 (Fla. 1984); Highlands Ins. Co. v. Gilday, 398 So.2d 834 (Fla. 4th DCA), rev. denied, 411 So.2d 382 (Fla. 1981); Relyea v. State, 385 So.2d 1378 (Fla. 4th DCA 1980), overruled on other grounds, 493 So.2d 1002 at 1005 (Fla. 1986); Worth v. Stahl, 388 So.2d 340 (Fla. 4th DCA 1980); and Gottschalk v. Smith, 334 So.2d 102 (Fla. 3d DCA), cert. denied, 341 So.2d 1085 (Fla. 1976).
Appellants rely upon this line of cases, specifically Relyea, Worth and Gottschalk, for the proposition that a landowner must have knowledge of prior, similar criminal acts in order to impose a duty to protect invitees from criminal acts of a third person. However, since these cases were decided, the Florida Supreme Court has held differently. Hall v. Billy Jack's, Inc., 458 So.2d 760 (Fla. 1984); Allen v. Babrab, Inc., 438 So.2d 356 (Fla. 1983); Stevens v. Jefferson, 436 So.2d 33 (Fla. 1983).
In Stevens, the widow of a bar patron who was shot and killed in a bar by another patron brought an action against the bar owner. Plaintiff showed at trial that the bar was a "rough" place with a history of fights and gunplay, and that the owner had terminated all security service and had left the premises in the charge of a female employee who could not maintain order. However, plaintiff failed to allege or prove that defendant knew of any dangerous propensities of decedent's assailant, and defendant contended on appeal that plaintiff could not prevail because of that lack of knowledge.
The supreme court affirmed the trial court's judgment against the bar owner. Following the general rule, the court stated that to impose liability on a tavern owner for injuries to patrons intentionally inflicted by third parties, the risk of harm to his patrons must be reasonably foreseeable. In its determination of foreseeability, the court held:
Although knowledge of a particular assailant's propensity for violence is often found to be evidence of foreseeability in these cases, we reject the contention ... that proof of foreseeability should be limited by law to evidence of actual or constructive knowledge of a particular assailant's propensity for violence. A tavern owner's actual or constructive knowledge, based upon past experience, that there is a likelihood of disorderly *326 conduct by third persons in general which may endanger the safety of his patrons is also sufficient to establish foreseeability.

436 So.2d at 35 (emphasis added).
Under the facts proven by plaintiff, the court found that a jury could determine that a foreseeable risk of harm to patrons existed, that the risk was either created or tolerated by defendant, that defendant could have remedied the danger but failed to do so, and that because of that failure to perform his duties, a patron was killed.
In Allen, the supreme court found that implicit in this court's opinion was the view that a tavern owner may be liable for injuries to its patrons caused by the tortious conduct of third parties only if the tavern owner knew or should have known of the dangerous propensities of that specific assailant. However, the court noted that this was the proposition rejected by the court in Stevens.
Allen reiterated the rule set out in Stevens that specific knowledge of an individual's dangerous propensities is not the exclusive method of proving foreseeability. Foreseeability also can be shown by proving that, based on past experience, a proprietor knew or should have known of the likelihood of disorderly conduct by third persons in general which might endanger the safety of the proprietor's patrons. Id. at 357. Furthermore, Allen stated that foreseeability of an intervening cause is a question for the trier of fact. Id.
In Hall, a tavern patron brought a negligence action against another patron and the tavern for injuries sustained in an assault. Plaintiff was assaulted by a patron as he watched a pool game in the tavern. The second district affirmed the trial court's judgment against the assailant. However, in reversing the judgment against the tavern, the district court held that Billy Jack's was not shown to have breached its duty to plaintiff because there was no evidence that Billy Jack's knew or should have known that the assailant would attack plaintiff without provocation.
On application for review, the supreme court noted that the district court had relied upon a theory of liability more narrow than that which the court had enunciated in Allen and Stevens. In accordance with Allen and Stevens, the court held that foreseeability may be established by proving that a proprietor had actual or constructive knowledge of a particular assailant's inclination towards violence or by proving that the proprietor had actual or constructive knowledge of a dangerous condition on his premises that was likely to cause harm to a patron. The court in Hall went further than either Allen or Stevens by stating:
A dangerous condition may be indicated if, according to past experience (i.e., reputation of the tavern), there is a likelihood of disorderly conduct by third persons in general which might endanger the safety of patrons or if security staffing is inadequate. These indicia are not exhaustive. If the lounge management knew or should have known of a general or specific risk to Hall and failed to take reasonable steps to guard against that risk and if, because of that failure, Hall was injured, Billy Jack's may be shown to have breached its duty and may be held financially responsible for Hall's injuries.
Id. at 762 (emphasis added). The court added that the question of foreseeability is for the trier of fact. Since the district court relied on a theory of liability which was too narrow, the supreme court remanded Hall for the jury's reconsideration in light of Allen and Stevens.
As illustrated by these three supreme court cases, appellants' argument that they were entitled to a directed verdict because appellees failed to produce evidence of the particular risk involved is without merit. The cases cited in support of this argument, Relyea, Gottschalk, Gilday, and Worth, all were decided before Stevens, Allen, and Hall and are not in accord with those cases. Therefore, the conflicting evidence of the Rodeo Bar's inadequate security and fifty-eight police incident reports of problems at the Rodeo Bar, including crimes against persons within the past eighteen months, provided a basis for a *327 finding of foreseeability and precluded a directed verdict.

2. Defense of Independent, Active, Efficient, Intervening Cause.

Appellants also argue that whether they should have anticipated Carter's actions is a question of proximate cause, and proximate cause must be decided by the court where there is an active and efficient intervening cause.
Appellants' position that the intentional assaults and killing in the present case constitute an "independent intervening cause" insulating them from liability as a matter of law is without merit. The cases cited by appellant in support of this proposition, including Dep't of Transp. v. Anglin, 502 So.2d 896 (Fla. 1987); Florida Power & Light Co. v. Macias, 507 So.2d 1113 (Fla. 3d DCA), rev. denied, 518 So.2d 1276 (Fla. 1987); Florida Power & Light Co. v. Lively, 465 So.2d 1270 (Fla. 3d DCA), rev. denied, 476 So.2d 674 (Fla. 1985); and National Airlines, Inc. v. Edwards, 336 So.2d 545 (Fla. 1976), do not persuade.
In Holley v. Mt. Zion Terrace Apts., Inc., 382 So.2d 98 (Fla. 3d DCA 1980), a wrongful death action by the estate of a tenant who was raped and murdered while in her apartment against a landlord for negligence in failing to provide reasonable security measures, the third district discussed the concept of "independent intervening cause." The court stated:
It is well established that if the reasonable possibility of the intervention, criminal or otherwise, of a third party is the avoidable risk of harm which itself causes one to be deemed negligent, the occurrence of that very conduct cannot be a superseding cause of a subsequent misadventure.
As in Holley, the application of this principle to the case at bar is obvious. Since appellants are liable, if at all, for failing to protect its patrons from a criminal attack, they cannot escape responsibility because the criminal attack has actually taken place. Thus, the assaults and the killing in the present case do not fall within the definition of an "active and efficient intervening cause."
Furthermore, even if we were to find that the acts did constitute an active and efficient intervening cause, such a finding would not mandate a directed verdict. The traditional rule on intervening cause was stated in Rosier v. Gainsville Inns Assoc., 347 So.2d 1100 (Fla. 1st DCA 1977):
While the question of proximate cause in a negligence action is one for the court where there is an active and efficient intervening cause, Nance v. James Archer Smith Hospital, Inc., 329 So.2d 377 (Fla. 3d DCA 1976), still if such intervening cause is either foreseeable or might reasonably have been foreseeable by the defendant, his negligence may be considered the proximate cause of the injury notwithstanding the intervening cause.
347 So.2d at 1102. Since appellees established foreseeability of the shooting through the reports of numerous criminal activities (several involving weapons) on the premises in the 18 months prior to the incident, appellants' negligence in providing inadequate security may be considered the proximate cause of the injuries.
Florida case law clearly indicates that questions of foreseeability and, more specifically, adequate security and safety measures, are questions of fact for a jury. Hall, 458 So.2d at 762; Allen 438 So.2d at 357; Fernandez v. Miami Jai-Alai, Inc., 454 So.2d 1060 (Fla. 3d DCA 1984) (holding in part that conflicts in the evidence at trial as to whether prior crimes of violence had been committed on defendant's premises and as to whether defendant negligently trained, deployed, and supervised its security staff to protect its business invitees in the parking lot where plaintiff was assaulted do not permit a directed verdict for defendants); Rosier, 347 So.2d at 1102; Orlando Executive Park, Inc. v. P.D.R., 402 So.2d 442 (Fla. 5th DCA), rev. denied, 411 So.2d 384 (Fla. 1981), approved by Orlando Executive Park v. Robbins, 433 So.2d 491 (Fla. 1983); Meyers v. Ramada Hotel Operating Co., 833 F.2d 1521 (11th Cir.1987).

3. Defense That Injury Occurred Off Premises.

Appellants' final argument concerning this point on appeal is that they are not *328 liable to appellees since there was no voluntary assumption of a duty to patrons who parked off the premises of the Holiday Inn where the shootings actually occurred. In other words, appellants claim that, as a matter of law, their duty was circumscribed by the physical boundaries of the Holiday Inn property.
The record discloses that although the Rodeo Bar had a capacity of 240 people, on weekends appellants would admit 270 to 300 people with 50 to 75 people waiting outside. Fights occurred "all the time," and on weekends there were three or four fights every night. The deputy sheriff in charge of road patrol testified that the Sheriff's Department was well aware of the frequency of violent incidents at the Rodeo Bar.
On the night of the shootings there were two unarmed "security guards" on duty, one on each side of the motel complex. One guard described as a derelict who drank on the job was on the west side of the complex. Lewis Friend, an untrained temporary fill-in, was on the east side of the complex. The main duty of these two guards was to keep the parking lot open for the motel guests.
It cannot be disputed that the Fort Pierce Holiday Inn and its Rodeo Bar did not have sufficient parking. It also was undisputed that the Holiday Inn required its bar patrons to park off premises. On the west side of the property was an unpaved lot owned by the state. Appellants had installed lighting there and used the lot for parking. There was a Gulf station, Ingram's Fruit Stand and a Waffle House, all of which had parking facilities, on the east side of the Holiday Inn.
Whether Holiday Inns' security guards actually directed bar patrons to park on the adjacent property to the east was highly disputed at trial. Friend, the security guard, testified that his manager, Jansen, had told him to keep the parking lot open for the motel guests, and that bar patrons had to park elsewhere. He admitted that he was aware that the bar patrons parked at Ingram's and at the Waffle House. Although initially admitting that he had suggested to bar patrons that they park at Ingram's because it was closed for vacation, Friend later changed his testimony, claiming that he never directed or suggested that bar patrons park on the property adjacent to the east.
Both the manager and the assistant manager of the complex were aware that bar patrons parked off premises on adjacent property. Further, the general manager admitted that 40% to 50% of the bar patrons were required to park off premises, while the owner of another security company that had previously worked at the Holiday Inn testified that it was 80%.
As noted by appellants, Chateloin v. Flanigan's Enterprises, Inc., 423 So.2d 1002 (Fla. 3d DCA 1982), appears to be the only Florida case dealing with an incident which occurred off the premises. In that case, a patron was shot by another patron several miles from the tavern and a considerable time after the patrons had left the premises. The court held that the tavern owner was not liable for the patron's injuries because the injuries were "too remote as to time and place." That is not the situation in the present case, where appellees adduced evidence from which the jury could have found that the confrontation began on Holiday Inn's property and spilled over onto the adjacent parking lot, and that the shooting occurred only minutes after the individuals had crossed the property line.
Although not controlling authority, Ember v. B.F.D., Inc., 490 N.E.2d 764 (Ind. Ct. App., 2 Dist. 1986), reh'g denied, 521 N.E.2d 981 (1988), is on point and extremely persuasive in holding that a tavern owner can be liable for injuries to its patrons beyond the tavern's property lines. In that case, a bar patron injured in an assault in a parking lot across from the bar and often used by the bar's patrons brought an action alleging that the bar had breached the duty owed to its patrons.
Evidence adduced at trial showed that the pub was the "hottest bar in town" and, as a result, the pub had problems with excessive noise, bottle-throwing, and parking. The pub's only parking lot was located *329 behind the building, so its patrons routinely used other nearby lots while at the pub. Additionally, the pub's management was aware of at least five or six incidents of violence, both inside and outside the tavern. In an attempt to renew its liquor license, the pub had hired police and civilian patrols outside its premises to maintain order in the parking lot as well as any adjoining streets. The pub's management also reassured neighborhood residents that the hired police officer on duty would "check the parking lots in the area and so forth for any kind of thing that was happening." The plaintiff in Ember had parked his vehicle straddling the sidewalk directly across the street from the pub and was proceeding to cross the street to the pub when he was severely beaten.
The district court reversed a summary judgment for defendants due to the failure to consider the possible assumption of a gratuitous duty to protect persons outside the pub's premises. Insofar as the facts of the case at bar do not show an assumption of a gratuitous duty to protect persons outside Holiday Inn's premises, Ember is distinguishable from the present case. However, the court in Ember went on to state that other principles of premises liability also could support plaintiff's negligence action.
After finding that the pub owner knew that his patrons customarily used adjacent premises for parking in order to patronize the pub, the court stated:
An invitor's duty normally extends only to its "premises." However, we recognize that in this case "the premises" may not be limited to the area actually owned or leased by the Pub because its business activities extended beyond its legal boundaries.

A duty of reasonable care may be extended beyond the business premises when it is reasonable for invitees to believe the invitor controls premises adjacent to his own or where the invitor knows his invitees customarily use such adjacent premises in connection with the invitation. Here, the record supports a reasonable inference the Pub knew its parking lot was insufficient for its patron's use; additionally, the Pub was aware its patrons customarily used the parking lot across the street while patronizing it. The initial confrontation occurred at the entrance to this lot, which had similarly overflowed.
Indeed, we are unconvinced either Ember or other patrons of the Pub lost their invitee status while waiting outside the Pub's legal boundaries. In the recent case of Alholm v. Wilt (1984), Minn. App., 348 N.W.2d 106, the occurrence of an assault in a public alley behind the tavern did not bar the tavern's liability. The Minnesota Appellate Court found a reasonable inference of foreseeability of the attack due to the aggressive conduct of the patrons involved preceding their departure from the tavern.
Ember, 490 N.E.2d 764, 772 (emphasis added).
Similarly, the evidence in the present case shows that appellants knew their patrons customarily used adjacent premises for parking in order to patronize the Rodeo Bar. Friend, the security guard, admitted at trial that he had "suggested" that bar patrons park at Ingram's Fruit Stand, and a bouncer testified that the security guards instructed bar patrons to park elsewhere, such as at the fruit stand. Thus, appellants had a duty not only to its patrons who parked on the premises, but also to those who parked on the adjacent lots in accordance with the instructions of the security guards. The jury could well have found that the Holiday Inn and the bar were, in effect, utilizing the adjacent parking lots rent free for their own business purposes.
Udy v. Calvary Corp., 162 Ariz. 7, 780 P.2d 1055 (1989), also provides support for the proposition that harm caused, in whole or part, by an activity or condition on a particular premises cannot be viewed as unforeseeable as a matter of law merely because it happens to manifest itself beyond the property line. In Udy, the evidence showed that the Udys had asked their landlord on numerous occasions for permission to erect a fence around their *330 mobile home lot to keep their small children out of the busy street adjacent to their leased property. On each occasion, the landlord refused permission. Through no fault of the parents, their small child was hit by a truck after he chased a ball into the street. The parents brought an action against their landlord on their own behalf and on behalf of their child to recover for personal injuries suffered by the child. The trial court granted summary judgment for defendants.
On appeal, the Arizona appellate court reversed and held in part that a landowner's duty to his tenants is not circumscribed by the physical boundaries of the landlord's property as a matter of law. Id., 780 P.2d at 1061. The court stated:
The fact that Georgie's injury occurred beyond the boundaries of the leased premises may well be relevant in determining whether the Landlord acted reasonably, but it does not compel the conclusion that the Landlord owed Georgie no duty of care in the first place.
Id., 780 P.2d at 1060. Additionally, the court held:
Whether the Landlord acted in accordance with its duty to Georgie is a question that must be answered within the context of all the facts and circumstances of this case... .
Id., 780 P.2d at 1062.
We have determined that an opinion by this court extending an invitor's duty beyond the premises actually owned or leased where the invitor has extended its business activities beyond its legal boundaries would not conflict with any existing Florida decisions. In fact, Holley v. Mt. Zion Terrace Apts., Inc., 382 So.2d 98 (Fla. 3d DCA 1980), by analogy supports such a position. The defendant in Holley argued that its liability was foreclosed by the fact that the assault and murder did not take place in a common area it had the duty to maintain, but rather inside the victim's apartment. Since the basis for the plaintiff's case was the almost undisputed fact that the intruder could have entered the apartment only through the common walkway adjacent to the victim's window, the court stated that it was for the jury to determine whether the defendant's alleged breach of duty as to the areas outside the apartment was a legal cause of what happened inside. The jury in the instant case also properly determined the issue of whether appellants' alleged breach of duty on its premises was a legal cause of the shooting off its premises.

4. Admissibility of Evidence of Dissimilar Incidents.

The thrust of appellants' next argument is that the incidents in the fifty-eight offense reports allowed appellees to prove "guilt" by proving other crimes, and did not support foreseeability of a criminal shooting on the premises because the incidents in the reports (with the possible exception of three of them) were factually dissimilar from the present case. Furthermore, appellants argue that the probative value of these reports was greatly outweighed by the unfair prejudice and confusion of the issues which resulted. However, the lower court accepted the reports into evidence on the issues of foreseeability and duty, and there is a presumption of correctness in its ruling which appellants have not overcome. Exchange Nat'l Bank of Tampa v. Hospital and Welfare Board of Hillsborough County, 181 So.2d 9, 11 (Fla. 2d DCA 1965), cert. denied, 188 So.2d 806 (Fla. 1966).
A rule limiting the admissibility of evidence on the issue of foreseeability to testimony concerning prior similar acts has been rejected by the supreme court. In Stevens v. Jefferson, 436 So.2d 33, 35 (Fla. 1983), the court held that proof of foreseeability should not be limited by law to evidence of knowledge of a particular assailant's propensity for violence, but also should include evidence of "a tavern owner's actual or constructive knowledge, based upon past experience, that there is a likelihood of disorderly conduct by third persons in general which may endanger the safety of his patron." Hall v. Billy Jack's, Inc., 458 So.2d 760, 762 (Fla. 1984), went further and held that foreseeability also may be established by proof of inadequate security.
*331 Clearly, the fifty-eight offense reports pertaining to prior criminal incidents at the Rodeo Bar are evidence of appellants' knowledge of "a likelihood of disorderly conduct by third persons in general which may endanger the safety of his patrons." Had the trial court excluded these reports, the exclusion effectively would have prevented appellees from showing foreseeability through appellants' knowledge of their patrons' dangerous and "disorderly conduct." Therefore, a ruling limiting admissibility to those reports containing only similar criminal activity would be irreconcilable with the supreme court's holdings in Stevens, Allen, and Hall.
The present case is distinguishable from Ameijeiras v. Metropolitan Dade County, 534 So.2d 812 (Fla. 3d DCA 1988), rev. denied, 542 So.2d 1332 (Fla. 1989). In that case, the only reported criminal incidents were homosexual activity, illicit drug dealing and arson attempts. No violent crimes had been reported in the two years preceding the attack. However, in the instant case, there were fifty-eight reports of criminal acts occurring on appellants' property within the eighteen months preceding the shootings. Included were reports of an aggravated assault with a knife, an attempted sexual battery, discharging a firearm in public, an aggravated battery, twenty reports of burglary-grand theft, half of which occurred in autos parked in appellants' parking lot, and numerous reports of batteries and criminal mischief. Clearly, these prior criminal activities at the Rodeo Bar sufficiently established the foreseeability of the shootings.
Additionally, a rule limiting evidence of foreseeability to testimony concerning prior similar criminal acts would lead to results contrary to public policy. As stated by the first district in Paterson v. Deeb, 472 So.2d 1210, 1219 (Fla. 1st DCA 1985), (quoting from Isaacs v. Huntington Memorial Hospital, 38 Cal.3d 112, 211 Cal. Rptr. 356, 695 P.2d 653 (1985)), rev. denied, 484 So.2d 8 (Fla. 1986):
The rule has the effect of discouraging landowners from taking adequate measures to protect premises which they know are dangerous. This result contravenes the policy of preventing future harm. Moreover, under the rule, the first victim always loses, while subsequent victims are permitted recovery. Such a result is not only unfair, but is inimical to the important policy of compensating injured persons [citations omitted]. Surely, a landowner should not get one free assault before he can be held liable for criminal acts which occur on his property.
For the above reasons, the trial court in the present case correctly allowed the jury to consider all fifty-eight reports of criminal activity at the Rodeo Bar during the eighteen months preceding the shootings, even though the majority of the reports were crimes against property. Foreseeability is determined in light of all the circumstances rather than by a rigid application of a mechanical "prior similars" rule. Paterson, 472 So.2d at 1219. While evidence of prior similar incidents are helpful, a rule limiting evidence of foreseeability to prior similar incidents deprives the jury of its role in determining the question of foreseeability. Id. at 1219-1220. Although evidence of a violent crime against a person may be necessary initially to establish the issue of foreseeability, evidence of lesser crimes against both persons and property is also relevant and admissible in determining that issue. Czerwinski v. Sunrise Point Condominium, 540 So.2d 199 (Fla. 3d DCA 1989).
Appellants argue, however, that even if the evidence was relevant, it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. § 90.403, Fla. Stat. (1987). The cases cited by appellants on this point are inapposite, and no Florida case has excluded evidence of prior crimes as unfairly prejudicial. In short, this argument has no merit.
Finally, appellants argue that the trial court erred in refusing to give the jury a limiting instruction on the fifty-eight criminal reports. Appellants requested that the court give the following instruction to the jury:

*332 During the course of the trial, you have heard evidence that prior to August 28, 1982, there were acts of criminal activity at the Rodeo Bar including the parking lot. The fact that such events may have occurred is not evidence of negligence and shall not be considered as such in your deliberations. Such may be considered by you in regard to the issue of foreseeability.
After denying appellant's request, the court instead instructed the jury:
During the course of the trial so far and you will probably continue to hear evidence that prior to August 28, 1982, there were acts of criminal activity in other incidents at the Rodeo Bar, including the parking lot. The fact that such events may have occurred has been admitted for your consideration on the issue of foreseeability of the incident which occurred on August 28, 1982, and they are not admitted to prove negligence as to any other occurrence.
Appellants assert that this instruction did not sufficiently impress upon the jury the importance of considering the evidence of other crimes only to the extent of shedding light on the foreseeability issue. However, appellants' requested instruction was not a proper statement of the law: prior criminal incidents establish foreseeability and thereby establish one element for a finding of negligence. See Stevens; Allen; Hall. For this reason, the instruction given was proper.

B. LIABILITY OF HOLIDAY INNS, INC.
We next turn to a consideration of appellate issues dealing with the relationships of the defendants to one another as those relationships impact upon the primary issue of negligence.
Holiday Inns, Inc. asserts that it was sued on three different theories of recovery: (1) negligence in failing to provide adequate security on the hotel premises; (2) vicarious liability for the negligence of the security guard, Lewis Friend, who was acting in the course and scope of his employment; and (3) liability through its apparent agents, the owners and operators of the bar. Holiday Inns, Inc. argues that it was entitled to a directed verdict or to a judgment notwithstanding the verdict on each of these theories of recovery.

1. Negligent Failure to Provide Security.

Holiday Inns, Inc. argues that there was no evidence showing that it was in any way responsible for the selection and provision of security services at the hotel and bar; thus, it was entitled to a directed verdict on the negligence count.
The record discloses, contrary to these assertions, that Holiday Inns, Inc. retained the right to control the operation and security of the motel/bar. There was testimony that Holiday Inns, Inc. required its franchisee, Hospitality Venture, to follow certain procedures set out in the franchise agreement and in the "Standards of Operation" manual. Also, William Cox of Holiday Inns, Inc.'s Loss Prevention Department testified that managers of the franchisees were required to attend a fourhour class discussing "the things we feel are important in the areas of security, and things we think they should look into when establishing their own security programs... ." Holiday Inns, Inc. published a loss prevention manual which went to all the franchisees concerning guard programs and services, coordination with local police, and security coverage of the hotel. Furthermore, there was testimony that Holiday Inns, Inc. retained the right to inspect the premises several times a year to insure that Hospitality Venture was complying with the license agreement.
Clearly, Holiday Inns, Inc. knew of the parking problems at the Fort Pierce Holiday Inn through guest complaint cards. In fact, the evidence showed that in order to eliminate the guest complaints, parking on the hotel premises was restricted late at night, "where some of our onsite parking would be used for the bar patrons and then we would use off-site parking... ." There was also testimony that in August of 1982, the Fort Pierce Holiday Inn had a policy of requiring bar patrons to park off the premises.
*333 Holiday Inns, Inc. claims that it had no knowledge of the previous violent incidents which occurred at the Fort Pierce Holiday Inn and at the Rodeo Bar. Although it required its company-owned hotels to report violent incidents by way of incident reports, Holiday Inns, Inc. did not impose that requirement on its franchisees. Reporting systems are common in the hotel industry to keep a parent corporation abreast of violent incidents that occur on the premises. Even assuming that it had no knowledge of the prior violent incidents, Holiday Inns, Inc. retained operational control over the franchisee through the license agreement and cannot escape liability for its negligence by simply failing to keep abreast of its assumed duties.

2. Apparent Authority.

Appellees alleged in their complaint that Holiday Inns, Inc. was liable for the acts of its apparent agents, Hospitality Venture, Leisure Dynamics and Vista Management. In addition to liability for express or implied agency, a principal is also bound by acts and contracts which are within the apparent authority of its agent. The existence of an agency relationship is ordinarily a question to be determined by a jury in accordance with the evidence adduced at trial, and can be proven by facts and circumstances on a case-by-case basis. Orlando Executive Park, Inc. v. Robbins, 433 So.2d 491 (Fla. 1983).
The three elements needed to establish apparent agency, often referred to as agency by estoppel, are: (1) a representation by the principal; (2) reliance on that representation by a third person; and (3) a change of position by the third person in reliance upon such representation to his detriment. Robbins; Orlando Executive Park, Inc. v. P.D.R., 402 So.2d 442 (Fla. 5th DCA), rev. denied, 411 So.2d 384 (Fla. 1981). As Holiday Inns, Inc. correctly argues, all three elements must be proven before an apparent agency is established. Caranna v. Eades, 466 So.2d 259 (Fla. 2d DCA 1985). Furthermore, the doctrine of apparent authority rests on appearances created by the principal, not the agent. Taco Bell of California v. Zappone, 324 So.2d 121 (Fla. 2d DCA 1975). Notwithstanding Holiday Inns, Inc.'s argument to the contrary, appellees produced evidence at trial which satisfied all three elements thereby precluding a directed verdict.
In Orlando Executive Park, Inc. v. P.D.R., 402 So.2d 442, a motel guest brought an action against the motel owner and operator, Orlando Executive Park, Inc., and the parent company, Howard Johnson Company, for personal injuries sustained when she was assaulted in the motel hallway. The fifth district found in part that:
While OEP might not be HJ's agent for all purposes, the signs, national advertising, uniformity of building design and color schemes allows the public to assume that this and other similar motor lodges are under the same ownership. A HJ official testified that it was the HJ marketing strategy to appear as a "chain that sells a product across the nation." Additionally, the license agreement between HJ and OEP clearly gives HJ the right to control the architectural design and the "standards of operation and service ... and the licensee agrees at all times to conform to such standards."
Id. at 450 (emphasis added). Accordingly, the fifth district held that there was sufficient evidence of representations to the public by Howard Johnson's to satisfy that element of apparent agency.
In Sapp v. City of Tallahassee, 348 So.2d 363 (Fla. 1st DCA), cert. denied, 354 So.2d 985 (Fla. 1977), an employee of a Holiday Inn motel who had been robbed and severely beaten sued the franchisees of the motel, the franchiser, and the city for her personal injuries. Holiday Inns, Inc. argued that its franchise agreement providing that it and its licensees were separate entities precluded the finding of an agency relationship as a matter of law. The fifth district held that, notwithstanding such provision, other provisions of the agreement indicated varying degrees of control by Holiday Inns, Inc. Further, the court held that:
control and domination need not be actual but may be binding upon the principal if apparent. That is, if the principal has *334 held the agent out to the public as being possessed of the requisite authority, and a third person is aware of his authority and has relied on it to his detriment, then the principal is estopped from denying the agency relationship.
As in P.D.R. and Sapp, the facts in the present case show that there was sufficient evidence for the jury reasonably to conclude that Holiday Inns, Inc. represented to the public that it could expect a particular level of service at the Fort Pierce Holiday Inn and at its bar. The hotel, restaurant, and bar were owned by Hospitality Venture (a joint venture between Vista Management and Leisure Dynamics), and managed by Vista Management. Hospitality Venture had entered into a license agreement or franchise with Holiday Inns, Inc. to operate not only the hotel, but also the restaurant and bar as part of the "Holiday Inns System." There was testimony that Holiday Inns, Inc. gave Hospitality Venture, the franchisee, use of the Holiday Inns, Inc. logo and made the franchisee part of the corporation's reservation system. In fact, Holiday Inns, Inc.'s standard sign was displayed in front of the Fort Pierce Holiday Inn in order to draw customers through name recognition. Clearly, this evidence shows that Holiday Inns, Inc. represented to the public that this particular hotel was a part of the national chain of Holiday Inns and that it could find a certain level of service (and safety) at its hotel and bar.
Holiday Inns, Inc. also argues that there is no evidence of appellees' reliance on Holiday Inns, Inc. ownership and operation of the Rodeo Bar, and therefore, P.D.R. is distinguishable from the present case. Holiday Inns, Inc. claims that appellees patronized the Rodeo Bar because of its urban cowboy atmosphere, rather than because it was part of a Holiday Inn complex.
However, viewed in a light most favorable to appellees, there is evidence in the record from which a jury could have found that appellees had relied upon Holiday Inns, Inc.'s representations. Scott Turner testified that he had a sense of security and safety because the Rodeo Bar was at a Holiday Inn. Further, he stated that, "[w]hen you associate something with the Holiday Inn or Ramada Inn or something with a big name like that, you wouldn't think that you would have a rough place, they would let it, you know, have fights going on and all that kind of stuff... ."
Robbie Shelburne testified that the Rodeo Bar's location or placement in the Holiday Inn was significant to him. The Holiday Inn sign made him feel that "at a big place like that ... even though it was a bar ... everything is going to be okay... ."
Lisa Funston testified that she had been to the Rodeo Bar several times. She felt it was safe because, "[i]t's a Holiday Inn. It's a hotel. There's more people around beside people just there in the bar... ." Generally, Holiday Inns have the reputation of being "a vacation place for families... ."
Clearly, on the question of reliance, the jury had a right to conclude that appellees believed exactly what Holiday Inns, Inc. wanted them to believe  that the Fort Pierce Holiday Inn and its Rodeo Bar were part of Holiday Inns' system. The above testimony revealing Holiday Inns, Inc.'s extensive efforts to have its franchisee recognized by the public as part of its system presented an issue for the jury on the question of reliance which they obviously resolved in favor of appellees. P.D.R., 402 So.2d at 451. For these reasons, the evidence supported the jury's finding that Hospitality Venture, Vista Management, Inc., and Leisure Dynamics were the apparent agents of Holiday Inns, Inc. and were acting within the scope of their apparent authority.

3. Vicarious Liability for Lewis Friend.

Holiday Inns, Inc. argues that it was entitled to a directed verdict on appellees' claim that it was vicariously liable for the negligence of Lewis Friend. Friend was employed by Aristocrat Security and was working at the Rodeo Bar on the night of the accident.
This argument is without merit. The jury was not even instructed on such an issue. While the jury was instructed that *335 it was to determine whether Friend was negligent, it was not instructed to decide whether Holiday Inns, Inc. was to be responsible for his negligence.
Holiday Inns, Inc.'s liability was based on its own negligence in failing to provide adequate security, and its vicarious liability for Hospitality Venture, Vista Management and Leisure Dynamics as its apparent agents. Further, the jury knew that a default had been entered against Friend's employer, Aristocrat Security, for negligence in using untrained security guards. Therefore, the fact that the jury found Lewis Friend not negligent has no effect on the liability of Holiday Inns, Inc.

C. EXPERT TESTIMONY
Next, appellants urge that the trial court erred in permitting plaintiff's expert on grief and bereavement to testify and explain the Rices' response to their son's death. Generally, the decisions as to whether a witness possesses the necessary expertise and the range of subjects on which that expert may testify are within the discretion of the trial judge and will not be disturbed unless clearly erroneous and prejudicial to the adverse party. Quinn v. Millard, 358 So.2d 1378, 1382 (Fla. 3d DCA 1978); Executive Car & Truck Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA), rev. denied sub nom., Commercial Union Ins. Co. v. DeSerio, 480 So.2d 1293 (Fla. 1985). In the instant case, the trial judge's ruling was not clearly erroneous.
There are three applicable statutes to be considered. Sections 90.702 and 90.704, Florida Statutes (1989), provide:
90.702 Testimony by experts.  If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
90.704 Basis of opinion testimony by experts.  The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, him at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
In addition, section 90.403 provides:
90.403 Exclusion on grounds of prejudice or confusion.  Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. This section shall not be construed to mean that evidence of the existence of available third-party benefits is inadmissible.
In Kruse v. State, 483 So.2d 1383 (Fla. 4th DCA 1986), cause dismissed, 507 So.2d 588 (Fla. 1987), this court determined from these statutes that there are four requirements for determining the admissibility of expert testimony: (1) that the opinion evidence be helpful to the trier of fact; (2) that the witness be qualified as an expert; (3) that the opinion evidence can be applied to evidence offered at trial; and (4) that evidence, although technically relevant, must not present a substantial danger of unfair prejudice that outweighs its probative value.
Kruse rejected the requirement of general acceptance in the scientific community which evolved from the decision in Frye v. United States, 293 Fed. 1013 (D.C. Cir.1923) (excluding results of a lie detector test because the test had not been generally accepted by the scientific community). Noting that the evidence code contains no references to general acceptance in regard to the receipt of expert opinion evidence, Kruse adopted the relevancy/probative value balancing test in determining that testimony based on Post Traumatic Stress Syndrome is admissible. However, Kruse did state that, although there is no requirement to demonstrate general acceptance, the opinion must have some indicia of reliability. Kruse, 483 So.2d at 1386.
Within the requirement that the evidence be helpful to the trier of fact is *336 the premise that if the disputed issue is beyond the ordinary understanding of the jury, such testimony is admissible. Johnson v. State, 393 So.2d 1069, 1072 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). As stated in Nelson v. State, 362 So.2d 1017, 1021 (Fla. 3d DCA 1978), "[w]hen facts are within the ordinary experience of jurors, conclusions therefrom are left to the jury." Additionally, expert opinion testimony may not be based on speculation. Ehrhardt, Florida Evidence § 702.2 (2d Ed. 1984).
In the present case, the witness's testimony clearly assisted the jury, and appellants' argument that his testimony should have been excluded because the subject matter of the testimony was within the normal, everyday comprehension of jurors is without merit. The expert witness's research over a period of fifteen years and the research of others in the field indicate that there are patterns of responses to grief, stages of grief, and factors that exacerbate one's responses to grief. More specifically, he explained that people can now be categorized as falling into either normalized patterns of grief or complicated grief, and he explained those processes. Certain factors affect a person's grief, and the ability to recover from that grief.
The expert interviewed Mr. and Mrs. Rice before trial. Thus, he was able to explain to the jury the Rices' ordeal in working their way through the grief process, where they were in that grief process at the time of trial, what factors had adversely affected their response to their son's death and had affected their ability or inability to recover from their grief, and the pattern their grief was likely to take in the future. Clearly, the subject of grief and bereavement is not an area within the normal everyday comprehension of jurors, and the expert testimony was properly admitted to aid the jury in its consideration of the effect of David's death on his parents.
Additionally, the witness was undoubtedly qualified as an expert in the field of grief and bereavement. Having already obtained a Bachelor's Degree, a Master's Degree and a Ph.D. in sociology, he was working on his post-doctorate at Harvard University in the field of grief and bereavement. The witness has been researching and studying grief for fifteen years, and has received research grants from the federal and state governments and foundations in order to do so. As the author of several books and publications on death and dying, and grief and bereavement, he has taught at seminars and has provided training as a consultant to different groups including hospital staffs, nurses, physicians, social workers and people who work in facilities for the terminally ill on this subject. Further, he teaches psychologists and counselors so that they can understand grief and bereavement and provide more help to their patients. This is only a partial listing of the witness's qualifications. Thus, it cannot be said that the court erred in designating him an expert in the field of grief and bereavement.
Finally, appellants argue that the statements made by the expert witness should be excluded as their probative value was substantially outweighed by the danger of unfair prejudice under section 90.403, Florida Statutes (1989). Undoubtedly, there is a danger that the trier of fact may place undue emphasis on evidence offered by an expert, simply because of the witness's status as an expert. Also, the jury may infer that the expert, simply by virtue of his appearance for one party, is vouching for the credibility of that party. As already decided by this court in Kruse, however, these dangers are not themselves sufficient reasons to exclude opinion testimony.
In Kruse, the court noted that its expert had predicated her opinion on the reliability of the history obtained. Her diagnosis was dependent on the accuracy of the reports of the assault and the child's changes in behavior. "The jury was left free, as it should have been, to determine the validity of those reports in accepting, rejecting and weighing the testimony of the parents, the child, and the expert." Kruse, 483 So.2d at 1386.
Likewise, in the present case, the expert was cross-examined about his reliance on *337 what the Rices had told him, and that he was taking their statements at face value. The jury was free to reject his testimony, but they obviously chose not to. Further, appellants' objections to his testimony should be addressed to the weight of the testimony rather than to its admissibility. See Botte v. Pomeroy, 497 So.2d 1275, 1279 (Fla. 4th DCA 1986), rev. denied, 508 So.2d 15 (Fla. 1987).
For these reasons, the trial court acted within its discretion in admitting this expert evidence, and its ruling is affirmed.

D. CONCLUSION
Finally, appellees argue that the alleged errors previously discussed, combined with certain comments made by appellees' counsel referring to the "murder," and the "injustice" which had been done in the earlier criminal trial, impaired a calm and dispassionate consideration of the evidence and the merits of the case by the jury.
The trial court ruled that appellants had waived their objection to appellees' mention of "justice" in this case by not objecting to the expert's testimony that the Rices felt that an injustice had been done in the criminal case.
In fact, appellants, not appellees, were the parties responsible for bringing evidence of the prior criminal trial before the jury. Appellees had moved in limine to prevent appellants from cross-examining the expert witness about the criminal trial and its result. If the court was going to allow cross-examination concerning the criminal trial, appellees' counsel wanted to address the subject on direct without prejudice to their position that evidence of the criminal trial was inadmissible. Appellants' counsel argued that the criminal trial result was admissible and that the court should permit such evidence. The court denied appellees' motion in limine.
Throughout the trial, appellants questioned the witnesses about the criminal trial and even elicited testimony, over appellees' objection, that Carter had not been convicted of murdering Rice or of the attempted murder of Turner, but had been convicted of the attempted murder of Shelburne. The jury was instructed that evidence of the criminal trial was being allowed solely to demonstrate its impact on the plaintiffs below, that it involved different legal issues and a different burden of proof and, therefore, had no bearing on liability in this case. Any error arising with mention of the criminal trial in this lawsuit was invited by appellants.
There are no errors, either individually or cumulatively, which require reversal of these final judgments. Therefore, we affirm.
However, upon our consideration of appellants' amended motion for certification, we grant the motion and certify the following question to our supreme court as presenting a question of great public importance:
WHEN AN INVITOR HAS EXTENDED ITS BUSINESS ACTIVITIES BEYOND THE AREA ACTUALLY OWNED OR LEASED AND AN INVITEE IS INJURED IN THAT EXTENDED AREA, CAN THE INVITOR BE LIABLE UNDER A NEGLIGENCE THEORY?
AFFIRMED.
DELL and GUNTHER, JJ., concur.